UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* DAVID M. KAMMERER; | : | |
| STATE OF CALIFORNIA *ex rel.* DAVID M. KAMMERER; | : | CIVIL ACTION NO. 05-11518-RGS |
| STATE OF DELAWARE *ex rel.* DAVID M. KAMMERER; | : | |
| DISTRICT OF COLUMBIA *ex rel.* DAVID M. KAMMERER; | : | |
| STATE OF FLORIDA *ex rel.* DAVID M. KAMMERER; | : | |
| STATE OF GEORGIA *ex rel.* DAVID M. KAMMERER | : | |
| STATE OF HAWAII *ex rel.* DAVID M. KAMMERER; | : | |
| STATE OF ILLINOIS *ex rel.* DAVID M. KAMMERER; | : | **SECOND AMENDED FALSE CLAIMS ACT COMPLAINT** |
| STATE OF INDIANA *ex rel.* DAVID M. KAMMERER | : | |
| STATE OF LOUISIANA *ex rel.* DAVID M. KAMMERER; | : | |
| STATE OF MASSACHUSETTS *ex rel.* DAVID M. KAMMERER; | : | **JURY DEMAND** |
| STATE OF MICHIGAN ex rel. DAVID M. KAMMERER | : | |
| STATE OF NEVADA *ex rel.* DAVID M. KAMMERER; | : | |
| STATE OF NEW HAMPSHIRE *ex rel.* DAVID M. KAMMERER; | : | |
| STATE OF NEW MEXICO *ex rel.* DAVID | : | |

1

M. KAMMERER;

                :

**STATE OF NEW YORK** *ex rel.* DAVID M. KAMMERER

**STATE OF TENNESSEE** *ex rel.* DAVID  :
M. KAMMERER;

**STATE OF TEXAS** *ex rel.* DAVID M.  :
KAMMERER;

**STATE OF VIRGINIA** *ex rel.* DAVID M.  :
KAMMERER;

**and**                 :

**DAVID M. KAMMERER, individually,**

           **Plaintiffs,**      :

Vs.

**OMNICARE, INC.**          :
**1600 River Center II**
**100 East River Boulevard Center**
**Covington, Kentucky 41011**

**And**

**ABBOTT LABORATORIES**     :
**100 Abbott Park Rd.**
**Abbott Park, IL 60064-3500,**

**And**                 :

**ALZA CORPORATION**       :
**1900 Charleston Road**
**P.O. Box 7210**
**Mountain View, CA 94039,**

**And**                 :

**ASTRAZENECA**           :

PHARMACEUTICALS
1800 Concord Pike
P.O. Box 15437
Wilmington, DE 19850-5437,

And                                    :

BARR PHARMACEUTICALS          :
2 Quaker Road
PO Box 2900
Pomona, NY 10970,

And                                    :

BAYER CORPORATION             :
100 Bayer Road, Building 4
Pittsburgh, PA 15205-9741,

And                                    :

ELI LILLY AND COMPANY         :
Lilly Corporate Center
Indianapolis, IN 46285,

And                                    :

GLAXOSMITHKLINE               :
200 North 16th Street
Philadelphia, PA  19102,

And                                    :

HOFFMAN - LAROCHE, INC.       :
340 Kingsland Street
Nutley, NJ 07110,

And                                    :

JOHNSON & JOHNSON             :
1 Johnson & Johnson Plaza
New Brunswick, NJ 08933

And                                    :

MERCK & CO., INC.             :
One Merck Drive

P.O. Box 100
Whitehouse Station, NJ 08889-0100

And                                    :

NOVARTIS CORPORATION          :
608 Fifth Avenue
New York, NY 10020,

And                                    :

NOVO NORDISK, INC.               :
100 College Road West
Princeton, NJ 08540,

And                                    :

PHARMACIA        CORP.          :
235 East 42nd Street
New York, NY 10017

And                                    :

PFIZER, INC.
235 E. 42nd Street
New York, N.Y.  10017-5703

And

WYETH-AYERST                     :
5 Giralda Farms
Madison, NJ 07940,

    Defendants,


## SECOND AMENDED FALSE CLAIMS ACT COMPLAINT
## AND DEMAND FOR JURY TRIAL

# I. INTRODUCTION

1. This is an action brought pursuant to the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.,* and pursuant to the false claims laws of seventeen states and the District of Columbia (hereinafter collectively referred to as "the FCA"), by the relator, David M. Kammerer, in his own capacity and on behalf of the United States of America and the states of California, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana Louisiana, Massachusetts, Michigan, Nevada, New Hampshire, New Mexico, New York, Tennessee, Texas, Virginia, and the District of Columbia. This action seeks treble damages and civil penalties on behalf of the federal government and the state government plaintiffs arising from the defendants': (i) conspiracies to get false or fraudulent claims paid by the federal-state Medicaid program (Title XIX of the Social Security Act) in all states in which Omnicare does business; (ii) causation and making of false claims presented to federal and state officials and employees administering these Medicaid programs and other federal health programs; (iii) the causation, making and use of false records to get such false claims paid; and, (iv) the making of false statements to avoid an obligation to pay funds owed to these Medicaid Programs pursuant to the Medicaid Rebate Program, codified at 42 U.S.C. § 1396r-8.

2. The Complaint alleges a series of illegal transactions in which the defendants other than Omnicare, Inc. (referred to herein as the "pharmaceuticals manufacturer defendants") paid remuneration, in the form of concealed "post-purchase discounts" and rebates, as well as free goods, price-freezes, grants and other cash payments, to defendant Omnicare, Inc. ("Omnicare"),

to induce Omnicare to purchase their patented, brand name pharmaceutical drugs and increase purchases of their drugs compared to competing drugs.   Defendant Omnicare, headquartered in Covington, Kentucky, provides pharmaceutical services and distributes pharmaceuticals primarily for long-term care facilities and nursing homes throughout the United States.  Relator alleges that Omnicare took affirmative steps to increase the sales of these companies' products vis-à-vis competing drugs as a direct result of these illegal inducements, including substituting drugs for those prescribed without proper physician authorization as required under state law. Relator further alleges that Omnicare and the drug manufacturer defendants took affirmative steps to conceal from federal and state government auditors the illegal remuneration alleged herein; for instance, Omnicare executives requested, and the drug manufacturer defendants agreed to send false invoices to Omnicare pharmacies that left off the existence and terms of the rebates and "post purchase discounts."   In addition, the drug manufacturer defendants did not disclose their grants and other cash and in-kind remuneration on the invoices sent to Omnicare.

3.  As a result of these secret and illegal transactions, the pharmaceutical company defendants violated the FCA by knowingly:  (i) causing Omnicare to submit claims to state and federal officials administering the Medicaid program that were false because Omnicare, as a recipient of illegal kickbacks from the drug manufacturers, was ineligible to seek payment of Medicaid funds; (ii) causing Omnicare to submit claims to these Medicaid officials that were false because the billed-for drugs had not been dispensed or prescribed in accordance with federal and state law, but rather had been dispensed as a result of Omnicare's illegal substitution of drugs for physician-prescribed drugs or had been prescribed as a result of Omnicare's false or misleading representations to physicians regarding the drugs;  (iii) conspiring with Omnicare to get the foregoing false or fraudulent claims paid by the federal-state Medicaid program; (iv)

creating false records - - such as inflated invoices that failed to disclose the post-purchase

discounts and rebates, and the cash grants and other remuneration paid to Omnicare to induce

purchases of the drug - - to further the conspiracy to defraud the Medicaid program; and (v)

making false statements to Medicaid concerning their best prices to customers to avoid payment

of rebates owed Medicaid under the Medicaid Rebate Program, 42 U.S.C. § 1396r-8, and making

false statements to other government payers concerning their best prices to get false claims paid.

    4. As a result of the illegal transactions described above, defendant Omnicare violated

the FCA : (i) submitting claims to state and federal officials administering the Medicaid

program that were false because Omnicare, as a recipient of illegal kickbacks from the drug

manufacturers, was ineligible to seek payment of Medicaid funds; (ii) submitting claims to these

Medicaid officials that were false because the billed-for drugs had not been dispensed or

prescribed in accordance with federal and state law, but rather had been dispensed as a result of

Omnicare's illegal substitution of drugs for physician-prescribed drugs or had been prescribed as

a result of Omnicare's false or misleading representations to physicians regarding the drugs; (iii)

conspiring with the drug manufacturer defendants to get the foregoing false or fraudulent claims

paid by the federal-state Medicaid program; and (iv) causing, assisting and using false records

to get false claims paid - - such as the invoices prepared by the drug manufacturer defendants

that failed to disclose the post-purchase discounts and rebates, and the cash grants and other

remuneration paid to Omnicare to induce purchases of drugs.

## II. JURISDICTION AND VENUE

    5. This is a civil action arising under the laws of the United States to redress violations of

the federal FCA, 31 U.S.C. §§ 3729 *et seq.* This court has jurisdiction over the subject matter of

this action: (i) pursuant to 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this

7

Court for FCA actions; (ii) pursuant to 28 U.S.C. § 1331, which confers federal subject matter

jurisdiction; and (iii) pursuant to 28 U.S.C. § 1345, because the United States is a plaintiff.

6.  This court has supplemental jurisdiction over the claims brought on behalf of the state

plaintiffs under 28 U.S.C. §1367.

7.  This court has jurisdiction under 31 U.S.C. § 3732(a) over each of the defendants

because each of them can be found in, is authorized to transact business in, and is now

transacting business in this District. In addition, acts of said defendants which are proscribed by

31 U.S.C. § 3729 have occurred in this District.

8.  Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391.

9.  Jurisdiction over all state law claims alleged herein is proper under 31 U.S.C. §

3732(b).

## III. THE PARTIES

**QUI TAM PLAINTIFF DAVID KAMMERER**

10.  Qui Tam Plaintiff David M. Kammerer ("Relator" or "Kammerer"), a citizen and resident of

the State of Ohio, brings this action on his own behalf, as well as on behalf of the United States,

pursuant to 31 U.S.C. §3730(b)(1), and on behalf of the state plaintiffs, pursuant to the state false

claims statutes set forth herein.  Prior to filing this action, Relator, David M. Kammerer, on

multiple occasions has provided the bulk of the information herein alleged to the United States.

In particular, during interviews on June 2, 2003 and July 8, 2003,  Kammerer disclosed to

Special Agent Tom Harkness of the Food and Drug Administration and to Special Agent James J. O'Leary, Special Agent for the Office of Inspector General of the United States Department of Health & Human Services, that numerous pharmaceutical companies paid Omnicare concealed rebates and discounts to induce Omnicare to grant preferential treatment to the manufacturers' drugs.  In a contemporaneous letter, on June 25, 2003, Kammerer through counsel sent a letter to Special Agents Harkness and O'Leary.  In that letter, and in attachments to that letter, Kammerer specifically disclosed to these public officials that Omnicare forecasted profit based on the degree to which Omnicare managed to switch customers over from one drug to a competing drug, and that Omnicare actively worked to increase the market share of these certain drugs at the expense of the drugs' competitors. Moreover, the spreadsheets submitted with the disclosure letter specifically confirmed what Kammerer had told Special Agents Harkness and O'Leary: that Omnicare was paid special rebates by manufacturers in exchange for increasing the market share of their drug over the market share of their competitors.   In these disclosures, Kammerer further disclosed that "PAL [physician authorization letters] were used to help facilitate moving market share…from one drug to another drug that has equivalent therapeutic effects." June 25, 2003, Letter from Charlie Atkins, Esq. to Thomas G. Harkness and James J. O'Leary.  Special Agents Harkness and O'Leary were at the time among the lead government investigators looking into the truth or falsity of claims submitted by Omnicare and its pharmaceutical manufacturer suppliers.  In August 2003, Relator specifically alleged violations of the federal False Claims Act and state false claims laws as a result of Omnicare's steering patients and physicians towards certain drugs at the expense of competing drugs solely in order to increase its own profits.

11. Relator holds both BA and MBA degrees.  He was an employee of Omnicare from

September 1997 until his resignation in April 2002.  Relator began his employment as a financial

analyst for Tim Bien, R.Ph., FASCP, Omnicare Senior VP Purchasing & Professional Services.

Relator was responsible for preparing  spreadsheets and performing other types of financial analysis

to evaluate  potential "profit opportunities" which upper management proposed to achieve through

Omnicare purchasing initiatives, clinical initiatives, and Medicaid reimbursement.  It was routine for

Relator to develop models of these profit opportunities for upper management and then to forecast

profitability as the model caused shifts in market share from drug A to drug B (*i.e.,* shifts in the

amount of a given drug sold by Omnicare as a percentage of the total sales by Omnicare of that drug

and its competitors), or shifts in the prescribed dose forms of a particular drug. These models also

took into account the inducements that would be paid by different manufacturers if Omnicare

committed to buy exclusively from the manufacturer or to increase the manufacturer's market share

vis-à-vis its competitors.

     12.  In October 2000, Omnicare promoted Relator to Director of Medicaid Reimbursement.

In this position, at the direction of upper management, Relator also performed financial analysis of:

(i) the impact of the changes in the various states' Medicaid reimbursement policies on Omnicare

profits, and (ii) the methods proposed by upper management to mitigate any negative impact on the

company's profitability from such changes.

     13.  The alleged transactions set forth herein are based upon the direct and personal

knowledge of the Relator as a former insider within Omnicare's corporate headquarters.

     14.  Kammerer has not based his Complaint upon any prior public disclosures of the

allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation or

in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or

from the news media.  His lawsuit is derived solely from his position as an Omnicare insider.

Moreover, even if his lawsuit were deemed to be based upon a public disclosure, he is an original source under 31 U.S.C. §3730 (e)(4), and other state whistleblower statutes as hereinafter alleged. He has direct and independent knowledge of the information upon which the allegations are based and has voluntarily provided the information to the government before filing this qui tam action based upon that information.

**GOVERNMENT PLAINTIFFS**

15.    The United States of America, and the states of California, Delaware, Florida, Georgia, Hawaii, Illinois, Louisiana, Massachusetts, Michigan, Nevada, New Hampshire, New Mexico, New York, Tennessee, Texas, Virginia, and the District of Columbia, are the plaintiffs for whom recovery is sought for damages to the federal – state Medicaid programs, and other government-funded health programs including without limitation Medicare, CHAMPUS/TRICARE, and VA-funded programs.

**DEFENDANTS**

16.    Omnicare owns and manages pharmacies servicing long term care facilities, such as nursing homes and assisted living facilities.  On its web page, the company has held itself out as the nation's "leading provider of pharmaceutical care for seniors."  The company currently services more than 1.4 million residents in health care facilities in 47 states and Canada.  State Medicaid programs, which are funded by the federal government as well as the states, pay for a significant share of Omnicare's sales.

17.    Abbott Laboratories researches, manufactures, and markets a variety of health care products, including pharmaceutical drugs. Headquartered in Abbott Park, Illinois, Abbott Laboratories has eleven offices in six states and its products are used in over 130 countries worldwide.  Abbott Laboratories is a publicly-traded company that employs 50,000 people

worldwide.

18. Alza Corporation researches, manufactures, and markets a variety of health care products, including proprietary drugs and drug delivery devices. Headquartered in Mountain View, CA., Alza Corporation, which is a wholly-owned subsidiary of the publicly-traded Johnson & Johnson, employs over 11,000 people in the United States.

19. AstraZeneca researches, manufactures, and markets a variety of drugs, focusing specifically on drugs used in gastrointestinal, cardiovascular, and oncology, infection, neuroscience, respiratory, inflammation and therapeutic areas. Incorporated in the UK, AstraZeneca conducts business worldwide and has corporate offices in nine states, including Illinois. The company's U.S. headquarters are located in Wilmington, Delaware and AstraZeneca's products are available nationwide. AstraZeneca is a publicly-traded company with over 66,000 employees worldwide.

20. Barr Pharmaceuticals researches, manufactures, and markets proprietary and generic pharmaceutical drugs, specifically drugs used in several therapeutic categories including oncology, female healthcare, cardiovascular, anti-infectives and psychotherapeutics. Headquartered in Pomona, NY, Barr Laboratories has manufacturing facilities in six states and sells its products nationwide in the United States. A publicly-traded company, Barr Laboratories employs 1,400 people in the United States.

21. Bayer Corporation researches, manufactures, and markets a wide variety of health care products, including pharmaceutical drugs. Bayer Corporation is a publicly traded company with headquarters in Germany, but conducts business worldwide and employs 113,000 across the world. In the United States, Bayer has 55 facilities and offers over 10,000 products, including pharmaceutical drugs, for sale nationally.

22. Eli Lilly & Company researches, manufactures, and markets pharmaceutical drugs,

particularly drugs used in treating neurological, oncological, and diabetes health issues. With headquarters in Indiana, Eli Lilly & Company employs approximately 41,350 people worldwide and has several facilities located around the United States. A publicly-traded company, Eli Lilly & Company sells its products nationally in the United States as well as in 142 other countries.

23. GlaxoSmithKline develops, manufactures, and markets a wide variety of health care products, including over a hundred pharmaceutical drugs, both proprietary and generic. Glaxo SmithKline products are sold nationwide in the United States as well as globally. With headquarters in London, GlaxoSmithKline, a publicly traded company, employs over 100,000 people worldwide. GlaxoSmithKline is the result of a merger that included SmithKline Beecham.

24. Hoffman – La Roche Inc. researches, manufactures, and markets a wide variety of pharmaceutical drugs. With corporate headquarters in Nutley, NJ., Hoffman – La Roche Inc. operates in more than 60 countries while employing more than 65,000 people worldwide. Hoffman – La Roche Inc., a wholly owned subsidiary of Switzerland-based Roche Holding Ltd., sells its products nationwide in the United States and in over 150 other countries.

25. Johnson & Johnson researches, manufactures, and markets a variety of health care products, including pharmaceutical drugs. Johnson & Johnson owns over 250 operating companies that employ approximately 120,500 people in 57 countries. Johnson & Johnson sells products throughout the world, including nationwide in the United States. Johnson & Johnson is a publicly traded company with headquarters in New Brunswick, New Jersey.

26. Merck & Co. researches, manufactures, and markets vaccines and medicines in over twenty therapeutic categories. Merck employs over 60,000 worldwide and operates several manufacturing facilities in the United States. Merck sells its products nationally in the United States as well as in 150 other countries. Merck is a publicly traded company with corporate headquarters

13

located in Whitehouse Station, New Jersey,

27. Novartis Corporation researches, manufactures, and markets a variety of health care products and services, including pharmaceutical drugs. With headquarters in Switzerland, Novarits Corp. offers its products and services nationally in the United States as well as in over 140 countries across the world. Novartis Corporation is a publicly traded company that employs over 98,000 people worldwide.

28. Novo Nordisk researches, manufactures, and markets a variety of heath care products, including pharmaceutical drugs that are designed mainly to treat diabetes. With headquarters in Denmark, Novo Nordisk employs approximately 23,000 full-time employees in seventy-nine countries and sells its products nationwide in the United States as well as in 178 other countries. Novo Nordisk is a publicly traded company.

29. Pharmacia Corp., researches, manufactures, and markets a wide variety of proprietary pharmaceutical drugs. With headquarters in New York City, NY., Pharmacia Corp. offers its products worldwide, including throughout the United States, and is a wholly-owned subsidiary of Pfizer.

30. Pfizer, headquartered in New York, N.Y., is a manufacturer of pharmaceutical, consumer and animal health products with operations and sales world-wide. The company employs approximately 87,000 persons in 150 countries. Its 2006 revenues were $48.37 billion.

31. Wyeth Pharmaceuticals develops, manufactures, and markets a wide variety of health care products, including proprietary pharmaceutical drugs. With headquarters in Collegeville, Pennsylvania, U.S.A., Wyeth Pharmaceuticals' operates thirty-seven manufacturing facilities in seventeen countries and markets its products nationwide in the United States as well as in over 144 other countries. A publicly traded, wholly owned subsidiary of Wyeth, Wyeth

Pharmaceuticals, together with Wyeth Research, employ over 40,000 people worldwide.    Wyeth Pharmaceuticals previously did business as Wyeth-Ayerst.

## IV. GOVERNING LAW

### (A) Federal Health Care Program Anti-Kickback Statute/State Anti-Kickback Laws

32.  The Federal Health Care Program Anti-Kickback Statute, enacted as Section 1128B(b) of the Social Security Act, 42 U.S.C. § 1320a-7b, prohibits persons from paying, soliciting or receiving illegal remunerations in order to induce business reimbursable under federal or state health care programs (here, Medicaid).    42 U.S.C. § 1320a-7b(a).  The types of remuneration covered specifically include kickbacks, bribes, and rebates, whether made directly or indirectly, overtly or covertly, in cash or in kind.    42 U.S.C. § 1320a-7b(b).  The prohibited conduct includes remuneration intended to induce referrals of patients or the purchasing, leasing or ordering, or arranging of any good, facility, service or item to be paid for by Federal or State health care programs.    Id.  The law contains a number of safe harbors, including product-specific discounts disclosed on invoices, none of which apply to the non-product specific inducements alleged herein.    See 42 U.S.C. § 13201-7b(b)(3)(A); 42 C.F.R. § 1001.952(h). The states contain analogous anti-kickback statutes.    See, e.g., Florida Stat., Ch. 409.920(2)(e); Illinois 305 ILCS 5/8A-3(c); Michigan C.L.A. 400.601.

### (B) Medicaid Reimbursement for Pharmaceutical Drugs

33.  As a condition of paying part of the claims submitted to a state Medicaid program, the federal government requires states to pay pharmacies no more than the lower of their "estimated acquisition cost plus reasonable dispensing fee" or their "usual and customary charge to the general public" for: i) drugs other than "multiple source drugs" for which the federal government has

established a specific Medicaid payment limit under 42 C.F.R. § 447.332, and ii) any brand name drug that a physician has certified in his or her own handwriting as being medically necessary for a particular recipient. 42 C.F.R. § 447.331(b).   To arrive at an "estimated acquisition cost" most states look to the drug's Average Wholesale Price ("AWP"), as set forth in industry publications. State Medicaid programs require pharmacies to state their "usual and customary charge" to the "general public" on their bills to Medicaid.

### (C) Medicaid Rebate Program

34.   With limited exceptions, the Omnibus Budget Reconciliation Act of 1990, 42 U.S.C. § 1396a-v, requires a pharmaceutical company to enter into a "rebate agreement" with the U.S. Secretary of Health and Human Services in order to qualify any covered, outpatient prescription drug manufactured by the company for Medicaid payment.    42 U.S.C. § 1396r-8(a)(1). Compliance with this rebate agreement is a material condition precedent to Medicaid's agreement to pay claims for the drug. Id. The rebate agreement requires each of these drug manufacturers to pay a quarterly rebate directly to each participating state Medicaid program for each of the manufacturers' drugs purchased by that state under its Medicaid plan during the quarter. The rebate must be equal to the difference between the average manufacturer's price (AMP) and the manufacturer's best price, defined as the lowest price available, anywhere in the nation, from the manufacturer to any non-Medicaid payer, or 15.1% of AMP, whichever is greater. 42 U.S.C. § 1396r-8(c)(1).   Manufacturers selling covered, outpatient drugs paid for by state Medicaid programs must report their AMPs and best prices to the state Medicaid programs on a quarterly basis.   42 U.S.C. § 1396r-8(b)(3).     The Office of Inspector General of the Department of Health & Human Services has the right to audit the "best price" and "average

manufacturer's price" information submitted by the manufacturers. *Id.*    The state Medicaid programs report their total Medicaid drugs dispensed in the quarter to each drug manufacturer and the Secretary. 42 U.S.C. § 1396r-8(b)(2)(A). The Centers for Medicare & Medicaid Services ("CMS") computes the amount of the rebate that may be applied by each state program and the states use this information to notify and invoice each drug manufacturer for the quarterly rebate due.

### (D) Federal Supply Schedule

35.  The federal General Service Administration (GSA) negotiates Federal Supply Schedule (FSS) prices with drug companies with the goal of achieving for government agencies purchasing pharmaceutical drugs the "best price" that the companies offer their most favored customers;  in order to contract with the government to have a drug listed on the FSS, the GSA consequently requires drug companies to disclose to GSA their best prices to commercial customers, including all discounts and other price concessions.  48 C.F.R. § 538.270.  GSA will demand the "best price" for the FSS contract price unless it concludes that "the prices offered to the Government are fair and reasonable, even though comparable discounts were not negotiated." *Id.*  In addition, companies with a good listed on the FSS must agree to agree to reduce their FSS price for the good if they lower their prices to commercial customers during the contract term in a manner that adversely affects the relationship between the FSS price and the comparable commercial prices relied upon by the government in establishing the FSS price. See 48 C.F.R. § 538.272.

### (E) Pharmacy Provider Agreements

17

36.    In order for a pharmacy to be eligible to bill and obtain payment from Medicaid, the

state Medicaid programs require the pharmacy to abide by applicable federal and state law,

including federal and/or state anti-kickback law.    For example, in Illinois, in order to bill

Medicaid, a pharmacy must first enter into an agreement in which it acknowledges that

"compliance with such laws and handbook provisions [regarding services] is a condition of

payment for all claims submitted." (Agreement For Participation in the Illinois Medical

Assistance Program (available at: http://www.dpaillinois.com/enrollment/)).  The referenced

handbook provides in turn as follows:  "Providers are subject to State and federal laws pertaining

to penalties for vendor fraud *and kickbacks*." Handbook for Providers of Medical Services,

Chapter 100 – General Policy & Procedures, Section 136 (available at: http://www.dpaillinois.

com/handbooks/chapter100.html). (Emphasis added.)  In Michigan, pharmacies billing Medicaid

agree to comply with the policies and procedures for the Michigan Medical Assistance Program

contained in the Medicaid Provider Manual.   Medical Assistance Provider Enrollment &

Trading Partner Agreement (available at: http://www.michigan.gov/mdch/0,1607,7-132-

2945_5100-43782--,00.html). The Michigan Provider Manual expressly states that "receiving

kickbacks" is an example of prohibited "Medicaid fraud."   Michigan Department of Community

Health Medicaid Provider Manual, pp. 40-41 (available at:

http://www.michigan.gov/som/0,1607,7-192-29929-87572--,00.html).  In Florida, pharmacies

agree that they must be in compliance with federal, state and local law before Florida "may make

payments for medical assistance." Florida Non-Institutional Medicaid Provider Agreement

(available at: https://flmedprovenroll.com/provenroll/Jsp/checklist.html). The Provider

Handbook then sets forth the Florida Anti-Kickback Statute as an example of a law with which

providers must comply.   Agency for Health Care Administration Florida Medicaid Provider

General Handbook, Chapter 2, pg. 42. (available at: http://floridamedicaid.acs-inc.com/index.jsp?display=handbooks).

### (E ) Medical Practice Act Requirements

37.  As a general matter, pursuant to state laws, drugs requiring a prescription under federal or state law may only be dispensed by a licensed pharmacist acting upon a lawful prescription issued by a licensed physician.   In short, pharmacists are not authorized under the law to prescribe either a type, form or dosage of a controlled substance.  Such prescriptions must be made by physicians based upon their independent, professional judgment.

### (F)  The Federal False Claims Act

38.  The federal civil False Claims Act ("federal FCA"), 31 U.S.C. §§ 3729 et seq., imposes civil liability, *inter alia*, on any person who: i) knowingly presents or causes to be presented to the United States false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used a false statement to get a false claim paid or approved by the United States; (3) conspires to defraud the government by getting a false or fraudulent claim allowed or paid; or, (4) knowingly makes, uses or causes to be made or used a false statement to conceal, avoid or decrease an obligation to pay or transmit money to the United States.   The federal FCA defines "knowingly" to include not only acting with actual knowledge of the truth or falsity of claims, but also acting with "reckless disregard" or "deliberate ignorance" of the truth or falsity of claims.   The federal FCA provides a remedy of treble damages and mandatory penalties of $5,500 to $11,000 for each violation of the Act.  Pursuant

19

to the federal FCA's so-called "qui tam provision," 31 U.S.C. § 3730(b), private individuals may bring suit on their own behalf as well as on behalf of the United States to recover damages and penalties for the United States.   With certain exceptions set forth in the Act, the federal FCA provides that the private plaintiff, the so-called "qui tam plaintiff" or "relator", shall receive 15 to 25% of the government's recovery if the government intervenes in the case, or 25 to 30% if the qui tam plaintiff litigates the case on his or her own after a government declination.

### (G) State False Claims Laws

39.   The State plaintiffs herein have enacted similar laws that permit a private person to bring suit on behalf of the state to recover damages from persons that knowingly submit false claims to the state or engage in related misconduct, and that provide for rewards for the private person if the state prevails in the action.   The statutory cites to these laws are set forth herein.

### V.   THE FRAUDULENT TRANSACTIONS

### (A) CONCEALED "MARKET SHARE" REBATES

40.   For at least the last eight years, the pharmaceutical manufacturer defendants, in violation of federal and state anti-kickback law, have entered into agreements with Omnicare to pay remuneration in the form of cash rebates (sometimes referred to within Omnicare as "post-purchase discounts") to Omnicare to induce Omnicare to increase its purchases of pharmaceutical drugs from the pharmaceutical manufacturer defendants.   These agreements ordinarily set up a "tiered" rebate structure, with the amount of the available rebate on a drug (expressed as a percentage of the purchase price of the drug) increasing as Omnicare increased its purchases of the manufacturer's drug as a percentage of its total purchases of the drug and competing drugs used to treat the same condition.   This was known as a "market share rebate." Less frequently, the amount of the rebate increased according to the absolute volume of

Omnicare's purchases from the defendant drug manufacturer.

41.  In exchange for these rebates, Omnicare took affirmative steps to shift its customers, including Medicaid customers, over to the drugs of the manufacturers paying the rebates.  Thus, Omnicare's top executives pressured and directed staff in Omnicare pharmacies to do what was necessary to increase the market share of the drug in question.   The following paragraphs in this Section 5 of the Complaint detail examples of the rebates that constituted illegal kickbacks under federal and state law.

**Abbott Laboratories**

42.  In the fourth quarter of 2001, Abbott Labs paid Omnicare concealed discounts as follows: "upfront discount" and "post-purchasing" discounts of 6.0% total (equal to $269,700) on purchases of Flomax®; and an "upfront discount" of 88% (equal to $3,490,539) on purchases of K-Tab®, all in exchange for Omnicare's granting preferential treatment to these drugs vis-a-vis its competitor drugs.   Abbott Labs paid Omnicare similar inducements to favor Flomax and K-Tabs during other calendar quarters, and also paid Omnicare other illegal inducements with respect to other drugs.   Relator further alleges that Omnicare, as a direct result of the inducements presented by the opportunities to earn these discounts, took affirmative steps to increase the market share of Abbott Lab drugs at the expense of competitor-drugs, including using PALs to support its dispensing of Abbott Lab drugs when a physician had, in fact, prescribed a different drug.  In other words, Omnicare took steps to increase its purchase of these Abbott drugs as a percentage of Omnicare purchases of all drugs in the same competitive class of drugs.

**AstraZeneca Pharmaceuticals**

43.  On April 13, 2000, AstraZenica, through its National Account Director, John J. Toth,

Jr., knowingly offered Omnicare, through its Director of Purchasing, Dan Maloney, an agreement described as "highly confidential" pursuant to which Omnicare would be paid rebates of up to 13% calculated under a written formula that expressly based the level of the rebate on the market share that Omnicare "achieved" for AstraZeneca's drug Seroquel® . Thus, if Omnicare achieved less than a 5% market share for Seroquel vis-a-vis its competitor-drugs, then Omnicare received zero rebate, if Omnicare achieved more than a 5% market share for Seroquel, it received a 2..00% rebate, if it achieved more than a 10% market share for Seroquel, it received a 5.00% rebate, and so on, up to an agreement pursuant to which Omnicare would receive a 13.00% rebate if it achieved more than a 40.00% market share for Seroquel. This rebate was for an entire year, calculated quarterly. Relator alleges that Omnicare accepted this proposal, and AstraZeneca and Omnicare then concealed these rebates from the federal-state Medicaid program. Relator further alleges that Omnicare took affirmative steps to increase Seroquel's market share at the expense of its competitor-drugs, as a direct result of this inducement, including using PALs to support its dispensing of Seroquel when a physician had, in fact, prescribed a different drug. In addition, through the communication described above, AstraZeneca offered Omnicare a 1.00% rebate in exchange for Omnicare's positioning Seroquel as the "Preferred First Line Atypical Anti-psychotic. Omnicare and Astrazeneca entered into similar agreements with regard to Seroquel during other years. Omnicare and Astrazeneca also entered into similar agreements with regard to other drugs. For example, internal Omnicare documents indicate that Astrazeneca, in the fourth quarter of 2001, paid Omnicare "post purchasing discounts" based on market share or other preferential treatment, in the following amounts for the following drugs: Seroquel, 10% ($2,985,985), and Zestril®, 50% ($9,794,130). In addition, in the fourth quarter of 2001, Astrazeneca paid Omnicare concealed "up front

discounts" in the following amounts for the following drug: Nolvadex®, 13% ($419,657).

**Bayer Corporation**

44. On June 2, 1999, Bayer, through Market Manager Eric R. Anderson, knowingly reiterated its "Confidential" offer to provide Omnicare with rebates based on the market share that Bayer achieved for Bayer Corporation's Baycol ® tablets vis-a-vis Baycol's competitor-drugs. Thus, after a six month start up period, Bayer would provide Omnicare with a 4% rebate if Omnicare achieved a market share between 2.0 and 5.00% for Baycol, a 8% rebate if Omnicare achieved a market share between 5.1% and 10.0% for Baycol, and so on, through an agreement to pay Omnicare a 27% rebate if it achieved a market share of 30.1% or higher for Baycol. Omnicare accepted this proposal, Bayer and Omnicare concealed these rebates from the federal-state Medicaid program, and Omnicare took affirmative steps to increase Baycol's market share at the expense of its competitor-drugs, as a direct result of this inducement, including using PALs to support its dispensing of Baycol when a physician had, in fact, prescribed a different drug. Shortly after this arrangement was finalized, to the best of Relator's recollection, Bayer issued a warning concerning Baycol which caused Omnicare to cease its sales of the drug. Omnicare and Bayer also entered into similar agreements with regard to other drugs, however. For example, internal Omnicare documents indicate that Bayer, in the fourth quarter of 2001, paid Omnicare a "post purchasing discount" based on market share or other preferential treatment, in the following amount for the following drug: Adalat® CC, 25% ($1,271,061). In addition, in the fourth quarter of 2001, Bayer paid Omnicare a concealed "up front discount" of 6% ($305,055) on purchases of Adalat CC.

**Eli Lilly & Co.**

45. In the fourth quarter of 2001, Eli Lilly & Co. paid Omnicare a concealed "post-

purchasing" discount of 9.5% (equal to $9,874,262) on purchases of Zyprexa® in exchange for Omnicare's granting preferential treatment to Zyprexa vis-a-vis its competitor drugs. Eli Lilly paid Omnicare similar inducements to favor Zyprexa during other calendar quarters, and also paid Omnicare other illegal inducements with respect to other drugs. Omnicare, as a direct result of the inducements presented by the opportunities to earn rebates, took affirmative steps to increase the market share of Eli Lilly drugs, including Zyprexa, at the expense of competitor-drugs, including using PALs to support its dispensing of Eli Lilly drugs when a physician had, in fact, prescribed a different drug.

**Johnson & Johnson**

46. On August 1, 1998, Johnson & Johnson and Omnicare knowingly entered into an agreement whereby Johnson and Johnson, after a six month start-up period, agreed to pay Omnicare rebates based on the market share that Omnicare achieved for Johnson & Johnson's Risperdal® tablets compared to Risperdal's drug-competitors. Omnicare would get a 5% rebate during the first six months. After six months, it would get a 6% rebate if it achieved a market share between 35% and 37% for Risperdal, 9% if it achieved a market share between 37% and 42%, and 11% if it achieved a market share above 42%. In addition, Johnson & Johnson agreed to pay Omnicare a cash equivalent 1% "corporate overlay." All rebates as well as the 1% corporate overlay were conditioned on Omnicare's: (i) giving Risperdal® the Selected position in its drug formulary over all other and competing anti-psychotic drugs, (ii) favoring Risperdal over all other available branded drugs, and (iii) informing physicians of Risperdal's® formulary position, so as to "enhance compliance with this Agreement". Johnson & Johnson and Omnicare concealed these rebates from the federal-state Medicaid program, and Omnicare took affirmative steps to increase Risperdal's market share at the expense of its competitor-drugs as a

24

direct result of this inducement, including using PALs to support its dispensing of Risperdal

when a physician had, in fact, prescribed a different drug.    Johnson & Johnson and Omnicare

entered into similar agreements in other years with respect to Risperdal, and also entered into

similar agreements with regard to other drugs.    For example, in the fourth quarter of 2001,

Johnson & Johnson paid Omnicare the following "post-purchasing" discounts on the following

drugs, in exchange for Omnicare's granting preferential treatment to the drugs:  8%  (equal to $

2,282,609) on purchases of Duragesic®; 5% (equal to $326,003) on purchases of Ultram®; 14%

(equal to $866,096) on purchases of Ditropan® XL; 2% (equal to $98,640) on purchases of

Topamax®; 7% (equal to $231,897) on purchases of Reminyl®; 2% (equal to $51,956) on

purchases of Aciphex®; and 2% (equal to $50,212) on purchases of Regranex®.

**Merck & Co., Inc.**

47.  On or about May 3, 1999, Merck and Omnicare knowingly entered into an

agreement concerning the drugs Prinivil®, Vasotec®, Prinzide®, Mevacor®, Zocor®, Tim-XE,

Cozaar®, Hyzaar® and Fosamax® whereby rebates ranging from 5% to 28% could be obtained

by Omnicare based upon market share increases brought about by its marketing efforts. These

rebates were available only to "closed shop" Omnicare pharmacies which provided data to

Merck as required by the agreement. Rebates were paid quarterly, in a single check representing

the total of rebates earned by Omnicare for the period. Omnicare agreed not to undertake any

program that, in any way, encouraged the practice of switching patients from any of the said

drugs; any such action by Omnicare was declared a material breach of the agreement. All

agreement information was deemed confidential and advance notice was required before any

such information was required to be disclosed pursuant to applicable law.    Merck and Omnicare

concealed these rebates from the federal-state Medicaid program.  Omnicare, as a direct result of

the inducements presented by the opportunities to earn rebates, took affirmative steps to increase

the market share of the aforementioned Merck drugs at the expense of competitor-drugs,

including using PALs to support its dispensing of these drugs when a physician had, in fact,

prescribed a different drug.  Merck entered into similar agreements with Omnicare with regard to

the aforementioned drugs in other years.

**Novartis**

48.  In the fourth quarter of 2001, Novartis paid Omnicare concealed discounts as

follows: "upfront discount" and "post-purchasing" discounts of 8.0% total (equal to $1,068,955))

on purchases of Miacalcin®; "up-front" and "post-purchasing" discounts of 15% total (equal to

$1,509,117) on purchases of Exelon®; an "upfront discount" of 13% (equal to $1,035,489) on

purchases of Clozaril®; and, a "post-purchasing" discount of 1.1% (equal to $38,142) on sales of

Trileptal®, all in exchange for Omnicare's granting preferential treatment to these drugs vis-a-

vis their competitor drugs.  Novartis paid Omnicare similar inducements to favor these drugs

during other calendar quarters, and also paid Omnicare other illegal inducements with respect to

other drugs.   Omnicare, as a direct result of the inducements presented by the opportunities to

earn these discounts, took affirmative steps to increase the market share of Novartis' drugs at the

expense of competitor-drugs, including using PALs to support its dispensing of such drugs when

a physician had, in fact, prescribed a different drug.

**Novo Nordisk**

49.  In the fourth quarter of 2001, Novo Nordisk paid Omnicare concealed discounts as

follows: "upfront" and "post-purchasing" discounts of 53.2.0% total (equal to $2,223,211)) on

purchases of Novolin N®; "up-front" and "post-purchasing" discounts of 53.20% total (equal to

$2,113,554) on purchases of Novolin 70/30®; and "upfront" and "post-purchasing" discounts of

53.20% total (equal to $1,948,109) on purchases of Novolin Rl®.

**Pharmacia**

50. In the fourth quarter of 2001, Pharmacia paid Omnicare concealed discounts as follows: a "post-purchasing" discount of 15.0% (equal to $4,074,093) on purchases of Celebrex®; a "post-purchasing" discount of 12% (equal to $838,171) on purchases of Ambien®; a "post-purchasing" discount of 13% (equal to $826,022) on purchases of Detrol®; a "post-purchasing" discount of 6% (equal to $292,892) on purchases of Xalatan®, a "post-purchasing" discount of 4% (equal to $92,598) on purchases of Mirapex®, a "post-purchasing" discount of 2% (equal to $36,588) on purchases of Zyvox®, and, a "post-purchasing" discount of 11% (equal to $244,587) on purchases of Fragmin®, all in exchange for Omnicare's granting preferential treatment to these drugs vis-a-vis their competitor drugs. Pharmacia paid Omnicare similar inducements to favor these drugs during other calendar quarters, and also paid Omnicare other illegal inducements with respect to other drugs. Omnicare, as a direct result of the inducements presented by the opportunities to earn these discounts, took affirmative steps to increase the market share of Pharmacia's drugs at the expense of competitor-drugs, including using PALs to support its dispensing of Pharmacia drugs when a physician had, in fact, prescribed a different drug.

## (B) Grant Agreements, Management Meeting Funds And Other In-Kind And Cash Renumeration

51. Defendant Omnicare solicited from the drug manufacturer defendants, and the drug manufacturer defendants agreed to pay and did pay Omnicare illegal remuneration in exchange for inducing sales of their drugs to Medicaid customers under the guise of cash "grants" relating to the Omnicare "ReView" program. Omnicare maintained that its ReView program educated Omnicare pharmacists about the underutilization of many drugs that could be

beneficial for the elderly, which included, of course, the Medicaid-eligible population in the long term care facilities serviced by Omnicare pharmacies. Omnicare sought and received this grant money without making any representations to the defendants as to any costs that it had incurred in connection with the "ReView" program, or committing to perform specified work in exchange for these grants. Moreover, Relator witnessed his supervisor, Tim Bien, contact pharmaceutical companies and request and receive immediate injections of "grant money" on occasions when Joel Gemunder, Omnicare's CEO, was concerned that Omnicare's profits for the quarter otherwise would not satisfy Omnicare's investors.

52. The grant payments were ordinarily in round numbers. For example, the "grant amounts" contributed by the pharmaceutical manufacturer defendants during 2000 are shown in the following table:

28

**OMNICARE REVIEW GRANTS**

| PHARMACEUTICAL MFG | "DEPOSIT" | COMMENT/TOTAL |
|---|---|---|
| | | |
| ABBOTT LABS | $50,000; JUNE 2000 | $50,000 |
| ALZA | $50,000; JUNE 2000 | $50,000 |
| ASTRAZENECA | $75,000; JUNE 2000 | $75,000 |
| BARR LABS | $10,000; MARCH 2000 | $10,000 |
| BAYER | $10,000; JAN 2001 | $10,000 |
| ELI LILLY | $50,000; JUNE 2000 | $50,000 |
| GLAXOSMITHKLEIN | $50,000; APRIL 2000 | $50,000 |
| HOFFMAN- LA ROCHE | $20,000- JUNE 2000; $25,000 – AUG, 2000 | $45,000 |
| JOHNSON & JOHNSON | $1,000 – APRIL 2000; $100,000 X 2 – JUNE, 2000; $50,000-AUG. 2000 | $251,000 |
| MERCK | $25,000; JULY 2000 | $25,000 |
| NOVARTIS | $50,000; SEPT 2000 | $50,000 |
| NOVO NORDISK | $35,000; JUNE 2000 | $35,000 |
| PHARMACIA | $50,000; JUNE 2000 | $50,000 |
| PFIZER | $50,000; AUG 2000 | $50,000 |
| WYETH-AYERST | $40,000 – APRIL 2000; $10,000 – nov. 2000 | $50,000 |

53. The review program was a scheme that was entered into knowingly by Omnicare and the pharmaceutical manufacturer defendants to hide from Medicaid what were actually illegal kickbacks paid by the drug manufacturers to induce Omnicare to grant preferential treatment to their products over the products of their competitors. Omnicare and the drug companies hid these payments from the Medicaid program, leaving them off the invoices sent by the drug manufacturer defendants to Omnicare pharmacies that purported to reflect the terms of sale. Omnicare agreed to and did grant preferential treatment to the products of these companies as a result of these grant payments.

54. Beginning at least as early as 1999, and continuing at least through 2001, the drug manufacturer defendants also paid remuneration to Omnicare to induce Omnicare's purchases of

29

their drugs in the form of funds that were identified as ostensibly covering the costs of the attendance by the drug manufacturers at Omnicare's annual management meetings in Amelia Island.    However, these payments varied in amount from manufacturer to manufacturer, bore no rational relationship to the costs of the conference, and were requested by Omnicare, and paid by the drug manufacturer defendants, in order to secure Omnicare's business.

55.  On information and belief, the drug manufacturers offered and Omnicare accepted other forms of concealed cash and in-kind remuneration intended to secure Omnicare's business, including free product and various cash payments.

### (C) THERAPEUTIC INTERCHANGE PROGRAM

56.  Internally, Omnicare used the term "therapeutic interchange" to characterize the schemes pursuant to which Omnicare took steps to increase a drug's market share at the expense of its competitors in order to earn the rebates and other cash inducements offered by the manufacturer.  Omnicare misrepresented in a memo to its own Directors of Operations its motivation for the therapeutic interchange program.  Thus, Omnicare Senior Vice President Tim Bien stated there were: "several advantages to switching to the drug of choice; the drugs we have been switching to have the same or better efficacy; they save the payer money; and our costs go down.  It is for these reasons that it's imperative we continue increasing our market share in the drug of choice." (May 21, 1999, Memorandum from Tim Bien to Directors of Operations, Re: Price Increase Opportunity." These "drugs of choice," however, were drugs subject to kickback arrangements, and increasing the market share of these drugs would not always "save the payer money."  Bien also requested that the Directors of Operations increase their private pay prices on drugs that competed with the "drugs of choice" in order to help Omnicare reach its market share goals and to defray increased costs.  This reference to "increase costs" was also misleading as

Omnicare's costs for the other drugs had not increased.

57.  Bien directed and pressured the managers of Omnicare pharmacies to increase their sales of Omnicare-favored drugs at the expense of non-favored competing drugs.  One means employed by Omnicare to switch customers from a non-favored drug to a favored drug was the issuance by an Omnicare pharmacy of a "Physician Authorization Letter" or "PAL" to all physicians writing prescriptions for residents in facilities serviced by the pharmacy.  The PAL stated that the pharmacy would substitute certain drugs for other drugs if the doctor signed the PAL authorizing the pharmacy to do so.  In many instances, however, the PAL misrepresented the comparative costs and benefits of the drugs.   In other instances, pharmacies would switch over customers to the preferred drug even in the absence of the prescribing physician signing the PAL.  When the switches were accomplished through misleading PALs, or without the written authorization of the prescribing physician, these methods often violated state law.

### (D)  FALSE STATEMENTS AND FALSE CLAIMS

### 1.  <u>False Statements to Medicaid regarding "Best Prices"</u>

58.  Kammerer alleges on information and belief that the pharmaceutical manufacturer defendants did not disclose these concealed market share and other rebates, and the purchase inducements disguised as grant and management conference funds, to the Medicaid program as required by the Medicaid Rebate Program or to the federal General Services Administration (GSA) as required of companies selling goods on the Federal Supply Schedule (FSS) .   For example, Kammerer alleges that the significant second Quarter 2001 rebates paid by defendants Abbott Laboratories, Astra Zeneca Pharmaceuticals, Eli Lilly & Co., Glaxo SmithKline, Johnson & Johnson, Merck & Co, Novartis Corp., Novo Nordisk, Inc. and Pharmacia Corp. on various products, which are set forth in Exhibit A hereto, were not disclosed to the Medicaid Program

and the federal government in connection with these companies "best price" disclosures.
Kammerer alleges on information and belief, that the pharmaceutical manufacturer defendants
falsely represented to Medicaid and other federal government payers that their "best prices" were
amounts that exceeded the post-rebate, dead net prices given to Omnicare.   In doing so, they
knowingly made false statements to avoid an obligation imposed by the Medicaid Rebate
Program and other laws to pays funds to federal and state governments.

59.   The bases for Kammerer's allegation in the immediately preceding paragraph
include the following two facts:  First, while at Omnicare, Kammerer reviewed "best price" files
on CMS's website that contained Federal Supply Schedule (FSS) prices, among other
government prices, for many brand name drugs.   In reviewing these files, Kammerer saw that,
for many drugs, the  FSS "best prices" were significantly higher than Omnicare's dead net cost
for the same drugs for the same period of time.   The federal General Service Administration
negotiates FSS prices with drug companies with the goal of achieving for the government the
"best price" that the companies offer their most favored customers, and requires drug companies
to disclose their best prices to commercial customers, including all discounts and other price
concessions.  See 48 C.F.R. Part 538.   Relator consequently concluded that, in those instances
in which Omnicare's dead net cost is significantly lower than the FSS price, it is likely that that
the drug manufacturers are withholding from government payers the deep post-purchase
discounts and rebates provided to Omnicare.  Second, while at Omnicare, Relator learned from
Omnicare Senior Vice President Tim Bien that Omnicare and the drug manufacturers wished to
keep the rebate information highly confidential for several reasons, including their desire to
conceal the existence and amount of the rebates from government auditors.   Accordingly, to
further this goal, the pharmaceutical manufacturer defendants and Omnicare agreed that the

manufacturers would not disclose the existence or terms of the rebates on the invoices sent to Omnicare pharmacies. Moreover, within Omnicare, the purchasing department shared information about Omnicare's true dead net cost for drugs with only a handful of top executives.

## 2. False Statements Concerning Terms of Sale

60. The defendant pharmaceutical manufacturers agreed with Omnicare not to disclose the existence or terms of the market share and other rebates on the invoices that they sent to Omnicare pharmacies to reflect the terms of sale. The invoices sent to the Omnicare pharmacies consequently contained false information regarding the terms of sale. The invoices sent by the drug manufacturer defendants to Omnicare were also false in that they did not reveal the Review grants and management conference payments and other cash and in-kind payments, which also were part of the terms of sale.

61. The defendant manufacturers created, and Omnicare caused and assisted the creation of these invoices that falsely recorded the terms of sale with full knowledge that the invoices were false. Moreover, Omnicare, with full knowledge that the invoices were inflated, used the invoices in its pharmacies as official records of the terms of sale.

## 3. False Statements on Provider Agreements

62. Omnicare knowingly made additional false statements on provider agreements submitted to the federal-state Medicaid programs; in particular, Omnicare agreed that it would comply with applicable federal and state laws, including anti-kickback law and the laws governing pharmacies and the practice of medicine, despite the fact that it knew it would not and could not comply with such laws as it had entered into kickback arrangements with the pharmaceutical manufacturer defendants, and was undertaking illegal therapeutic interchange schemes.

#### 4.  Purpose of False Statements

63.    The foregoing false records were created and used in furtherance of the conspiracy between Omnicare and the defendant drug manufacturers to defraud the Medicaid program, to get false claims paid by the federal-state Medicaid program and other federal government payers, and to assist the defendant drug manufacturers avoid their obligation to pay rebates to Medicaid under the Medicaid Rebate Program.

#### 5.  False Claims for Medicaid Payment

64.    A significant percentage of the Omnicare "drugs of choice" that Omnicare favored through its therapeutic interchange program in exchange for drug manufacturer rebates were sold to Medicaid beneficiaries and covered under the Medicaid program.  To obtain payment for these drugs, Omnicare presented claims to the administrators of the federal-state Medicaid program employed by the states.   The states paid Omnicare's claims, and presented claims to the federal government to obtain the federal share of the reimbursement that the states paid Omnicare.   The Omnicare claims were false because Omnicare was ineligible for payment due to its receipt of illegal kickbacks and the illegal methods it employed to switch customers to its "drugs of choice." The state claims for federal share likewise were false in that they effectively passed on Omnicare's false claims and/or sought payment for the false claims of Omnicare.

65.    The drug manufacturer defendants knowingly caused Omnicare to make these false claims for payment to the administrators of the federal-state Medicaid program, and knowingly caused the states to submit false claims for federal funding.   Omnicare knowingly submitted these false claims for payment to administrators of the state-federal Medicaid program, and knowingly caused the states to submit false claims for federal financing of Omnicare's false claims.

### 4. Conspiracy to get False or Fraudulent Claims Paid

66.   Through the acts and omissions set forth above, Omnicare entered into separate conspiracies with each of the pharmaceutical manufacturer defendants to get false or fraudulent claims paid by the federal-state Medicaid program.    Thus, with each pharmaceutical manufacturer defendant, Omnicare agreed to: (i) accept a financial payment in exchange for purchases of drugs from the manufacturer;  (ii) use invoices to record the terms of sale that concealed the financial payment, and thereby assisted the drug manufacturers conceal the payment from state Medicaid programs and maintain the profit margin or "spread" they could offer Omnicare; and (iii) favor the drugs of the manufacturer over competitor drugs in exchange for the inducement by increasing its purchases of the drugs relative to competing drugs, refraining from switching customers over to competing drugs, and/or switching customers over to the drugs.

### COUNT ONE – FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)-(3) and (7)

67.  Plaintiff re-alleges Paragraphs 1 through 66, inclusive.

68.  Based on the conduct alleged herein, the defendants are liable under 31 U.S.C. § 3729(a)(1), which imposes liability on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval."

69.  Based on the conduct alleged herein, the defendants are liable under 31 U.S.C. § 3729(a)(2), which imposes liability on any person who "knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government."

70. Based on the conduct alleged herein, the defendants are liable under 31 U.S.C. §

3729(a)(3), which imposes liability on any person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid."

71. Based on the conduct alleged herein, the pharmaceutical manufacturer defendants are liable under 31 U.S.C. § 3729(a)(7), which imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."

## COUNT TWO – CALIFORNIA FALSE CLAIMS LAW,
### Cal. Gov. Code § 12650

72. Plaintiff re-alleges paragraphs 1-66 inclusive.

73. Based on the foregoing allegations, the Defendants are liable under Cal. Gov. Code § 12650, *et seq*.

## COUNT THREE – DELAWARE FALSE CLAIMS AND REPORTING ACT,
### 6 Del. C. § 1201, et seq.

74. Plaintiff re-alleges paragraphs 1-66 inclusive.

75. Based on the foregoing conduct, Defendants are liable under the Delaware False Claims and Reporting Act, 6 Del. C. § 1201, *et seq*.

## COUNT FOUR – D.C. PROCUREMENT RELATED CLAIMS ACT,
### D.C. Code § 2-308.13, *et seq*.

76. Plaintiff re-alleges paragraphs 1-66 inclusive.

77. Based on the foregoing conduct, Defendants are liable under the District of Columbia Procurement Related Claims Act, D. C. Code § 2-308.03, *et seq*.

## COUNT FIVE – FLORIDA FALSE CLAIMS ACT,

**Fla. Stat. §§ 68.081-68.09**

78.  Plaintiff re-alleges paragraphs 1-66 inclusive.

79.  Based on the foregoing conduct, Defendants are liable under the Florida False
Claims Act,

Fla. Stat. §§ 68.080 et seq.

## COUNT SIX – GEORGIA STATE FALSE MEDICAID CLAIMS ACT,
### Georgia Code, Title 49, Ch. 4

80.  Plaintiff re-alleges paragraphs 1-38 inclusive.

81.  Based on the foregoing conduct, Defendants are liable under the Georgia State False

Medicaid Claims Act, Georgia Code, Title 49, Ch. 4.

## COUNT SEVEN – HAWAII  FALSE CLAIMS LAW,
### HRS § 661-21, *et seq.*

82.  Plaintiff re-alleges paragraphs 1-66 inclusive.

83.  Based on the foregoing conduct, Defendants are liable under the Hawaii false

claims law, HRS  § 661-21, *et seq*.

## COUNT EIGHT – IlIINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT,
### 740 ILCS 175/1 *et seq.*

84.  Plaintiff re-alleges paragraphs 1-66 inclusive.

85.  Based on the foregoing conduct, Defendants are liable under the Illinois

Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq*.

## COUNT NINE – INDIANA FALSE CLAIMS & WHISTLEBLOWER PROTECTION LAW,
### Ind. Code § 5-11-5.5.-1, *et seq.* (2005)

86.  Plaintiff re-alleges paragraphs 1-66, inclusive.

87.  Based on the foregoing conduct, Defendants are liable under the Indiana False

Claims & Whistleblower Protections Law, Ind. Code § 5-11-5.5-1, *et seq*.

## COUNT TEN – LOUSIANA QUI TAM ACTION ACT,
### La. R. S. 46:438:3, *et seq.*

88.   Plaintiff re-alleges paragraphs 1-66 inclusive.

89.   Based on the foregoing conduct, Defendants are liable under the Louisiana Qui Tam

Action Act, La. R. S. 46:439.1, *et seq.*

## COUNT ELEVEN -  MASSACHUSETTS FALSE CLAIMS LAW,
### ALM CH. 12 § 5A-0, *et seq.*

90.   Plaintiff re-alleges paragraphs 1-66 inclusive.

91.   Based on the foregoing conduct, Defendants are liable under the regulations of

the Massachusetts Department of the Attorney General, ALM GL ch. 12 § 5A-O.

## COUNT TWELVE - MICHIGAN MEDICAID FALSE CLAIMS ACT,
### MICH. CODE 400.601 *et seq.*

92.   Plaintiff re-alleges paragraphs 1-38 inclusive.

93.   Based on the foregoing conduct, Defendants are liable under the Michigan

Medicaid False Claims Act, Mich. Code 400.601 et seq.

## COUNT THIRTEEN – NEVADA SUBMISSION OF FALSE CLAIMS TO STATE OR LOCAL GOVERNMENT ACT,
### NRS § 357.010,  *et seq.*

94.   Plaintiff re-alleges paragraphs 1-66 inclusive.

95.   Based on the foregoing conduct, Defendants are liable under the Nevada

Submission of False Claims to State or Local Government Act, NRS  § 357.010, *et seq.*

## COUNT FOURTEEN – NEW HAMPSHIRE FRAUD & FALSE CLAIMS LAW,
### N.H. RSA § 167:58, *et seq.*

96.   Plaintiff re-alleged paragraph 1-66, inclusive.

97.    Based on the foregoing conduct, Defendants are liable under the New Hampshire Fraud

& False Claims law, N.H. RSA § 167:58, *et seq.*

### COUNT FIFTEEN – NEW MEXICO MEDICAID FALSE CLAIMS ACT, N.M. LAWS 49, § 1, *et seq.*

98.    Plaintiff re-alleges paragraphs 1-66 inclusive.

99.  Based on the foregoing conduct, Defendants are liable under the New Mexico

Medicaid False Claims Act, 2004 N. M. Laws 49, § 1, *et seq.*

### COUNT SIXTEEN - NEW YORK FALSE CLAIMS ACT 2007 N.Y. LAWS 58, § 38

100.  Plaintiff re-alleges paragraphs 1-38 inclusive.

101.  Based on the foregoing conduct, Defendants are liable under the New York False

Claims Act, 2007 N.Y. Laws 58, § 38.

### COUNT SEVENTEEN – TENNESSEE MEDICAID FALSE CLAIMS ACT, TENN. CODE ANN. § 71-5-181-185, *et seq.*

102.  Plaintiff re-alleges paragraphs 1-66 inclusive.

103.  Based on the foregoing conduct, Defendants are liable under the Tennessee

Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181, *et seq.*

### COUNT EIGHTEEN – TEXAS MEDICAID FRAUD PREVENTION STATUTE, TEX. HUM RES. CODE §36.001, *et seq.*

104.  Plaintiff re-alleges paragraphs 1-66 inclusive.

105.  Based on the foregoing conduct, Defendants are liable under the Texas Medicaid

Fraud Prevention Statute, Tex. Hum. Res. Code § 36.001, *et seq.*

### COUNT NINETEEN – VIRGINIA FRAUD AGAINST TAXPAYERS ACT, VA. CODE ANN. § 8.01-216.1-216.10, *et seq.*

106.  Plaintiff re-alleges paragraphs 1-66 inclusive.

107.  Based on the foregoing conduct,  Defendants are liable under the Virginia Fraud

Against Taxpayers Act, Va. Code Ann. § 8.01-216.1, *et seq.*

**WHEREFORE**, Relator prays that judgment be entered in favor of the United States, the several states and District of Columbia and Relator, as herein alleged in the foregoing Seventeen Causes of Action against the Defendants, ordering that:

A.    Each of the defendants respectively cease and desist their violations of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.* and the relevant state laws as above alleged;

B.    Each of the defendants pay an amount equal to three times the amount of damages the United States has sustained because of these defendants' actions, as above alleged, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §3729, *et seq.*;

C.    Each of the defendants pay to the each of the several states or district as herein above alleged, the damages and civil penalties as provided by the relevant statute.

D.    Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

E.    Relator be awarded the maximum amount allowed pursuant to the legislation or regulations of each state or district, as alleged above;

F.    Relator be awarded all costs of this action, including expenses and attorney fees and costs, pursuant to 31 U.S.C. § 3730(d), together with such costs as are provided pursuant to the legislation or regulations of each state, as alleged above; and,

G.    The United States, said states or district and Relator recover such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial

by jury for all issues herein properly so tried.

Respectfully submitted,

UNITED STATES OF AMERICA

*ex rel.* DAVID KAMMERER,

STATE OF CALIFORNIA
*ex rel.* DAVID KAMMERER, STATE OF
DELAWARE *ex rel.* DAVID KAMMERER,
DISTRICT OF COLUMBIA *ex rel.* DAVID
KAMMERER, STATE OF FLORIDA *ex rel.*
DAVID KAMMERER, STATE OF HAWAII
*ex rel.* DAVID KAMMERER, STATE OF
ILLINOIS *ex rel.* DAVID KAMMERER,
STATE OF INDIANA *ex rel.* DAVID KAMMERER,

STATE OF LOUISIANA *ex rel.* DAVID
KAMMERER, STATE OF
MASSACHUSETTS *ex rel.* DAVID
KAMMERER, STATE OF NEVADA *ex rel.*
DAVID KAMMERER, STATE OF NEW HAMPSHIRE
*ex rel.* DAVID KAMMERER, STATE OF NEW
MEXICO *ex rel.* DAVID KAMMERER,
STATE OF TENNESSEE ex rel. DAVID
KAMMERER, STATE OF TEXAS ex rel.
DAVID KAMMERER, STATE OF
VIRGINIA *ex rel.* DAVID KAMMERER,
and DAVID KAMMERER, individually,

/s/ Thomas P. Smith

_____
Thomas P. Smith, Esq., Mass.  BBO #555513
Caffrey & Smith, P.C.
300 Essex Street
Lawrence, MA. 01810

Tel. No. 978-686-6151
Fax No. 978-683-3399

41

Dated:

LEAD COUNSEL:

    /s/ Shelley R. Slade

Shelley R. Slade, Esq. (Admitted Pro Hac
  Vice)
Robert L. Vogel, Esq. (Admitted Pro
  Hac Vice)
Vogel, Slade & Goldstein, LLP
5225 Wisconsin Ave., N.W., Suite 502
Washington, D.C. 20015

Tel. No. (202) 537-5900
Fax No. (202) 537-5905

Dated:    December 5, 2008

42

# EXHIBIT A

# Significant Concealed Rebates Paid by Drug Manufacturers to Omnicare

Dates for col 12 - 15 are as of when the analysis was done - see col 8 for approx date

| | (1) Source | (2) Drug Name | (3) Strength | (4) Manufacturer | (5) % rebate Discount | (6) Upfront rebate/disc | (7) Total rebate/disc | (8) effective date (1) | (9) 2Q 01 total unit purchases | (10) Medicaid annual RXs | (11) AWP per RX | (12) Medicaid Revenue per RX | (13) OCR Dead Net unit Cost | (14) OCR Dead Net RX Cost | (15) Medicaid Profit per RX |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (1) | top 100 file | FLOMAX | | Abbott | 6% | 4% | 10% | Jan-01 | | | | | | | |
| (2) | top 100 file | K-TAB | | Abbott | 15% | | 15% | Jan-01 | | | | | | | |
| (3) | conversion files | Seroquel | | Astra Zeneca | $1.00 | 88% | 88% | 07/01/00 | | | | | | | |
| (4) | 2001 $ signs | Zestril | 10 mg | Astra Zeneca | 50% | | 50% | est 8/1/2001 | 3,414,200 | 309,554 | 28.35 | 29.24 | 0.39 | 11.82 | 17.42 |
| (5) | 2001 $ signs | Zestril | 2.5 mg | Astra Zeneca | 50% | | 50% | est 8/1/2001 | 855,800 | 77,593 | 18.70 | 20.73 | 0.26 | 7.79 | 12.94 |
| (6) | 2001 $ signs | Zestril | 20 mg | Astra Zeneca | 50% | | 50% | est 8/1/2001 | 2,119,100 | 192,132 | 30.36 | 30.99 | 0.42 | 12.65 | 18.35 |
| (7) | 2001 $ signs | Zestril | 30 mg | Astra Zeneca | 50% | | 50% | est 8/1/2001 | 113,800 | 10,318 | 43.84 | 42.86 | 0.61 | 18.27 | 24.59 |
| (8) | 2001 $ signs | Zestril | 40 mg | Astra Zeneca | 50% | | 50% | est 8/1/2001 | 678,100 | 61,481 | 44.14 | 44.14 | 0.63 | 18.87 | 25.26 |
| (9) | 2001 $ signs | Zestril | 5 mg | Astra Zeneca | 50% | | 50% | est 8/1/2001 | 2,656,800 | 240,883 | 27.72 | 28.67 | 0.38 | 11.55 | 17.12 |
| (10) | conversion files | Prozac | 90mg EC | Dista (Lilly) | | 5% | | Jul-01 | | | | | | | |
| (11) | conversion files | Prozac Weekly | | Dista (Lilly) | 19.5% | | 20% | 1997 | | | | | | | |
| (12) | conversion files | Axid | | Dista (Lilly) | 22% | | 22% | est 8/1/2001 | 3,188 | 2,168 | 75.60 | 70.81 | 12.49 | 49.96 | 20.85 |
| (13) | 2001 $ signs | Zyprexa | 10 mg | ELI LILLY & CO. | 9.50% | | 9.50% | est 8/1/2001 | 1,055,540 | 73,617 | 350.27 | 312.51 | 6.74 | 262.84 | 49.68 |
| (14) | 2001 $ signs | Zyprexa | 15 mg | ELI LILLY & CO. | 9.50% | | 9.50% | est 8/1/2001 | 150,720 | 13,665 | 402.96 | 358.88 | 10.08 | 302.38 | 56.51 |
| (15) | 2001 $ signs | Zyprexa | 2.5 mg | ELI LILLY & CO. | 9.50% | | 9.50% | est 8/1/2001 | 1,215,800 | 91,860 | 180.07 | 162.74 | 3.75 | 135.12 | 27.62 |
| (16) | 2001 $ signs | Zyprexa | 5 mg | ELI LILLY & CO. | 9.50% | | 9.50% | est 8/1/2001 | 1,125,740 | 72,905 | 222.63 | | 4.43 | 186.19 | 36.44 |
| (17) | 2001 $ signs | Zyprexa | 7.5 mg | ELI LILLY & CO. | 9.50% | | 9.50% | est 8/1/2001 | 272,900 | 15,464 | 266.07 | | 4.65 | 223.23 | 42.84 |
| (18) | 2001 $ signs | Zyprexa | 10 mg | ELI LILLY & CO. | 9.50% | | 9.50% | est 8/1/2001 | 331,600 | 30,065 | 297.49 | | | | |
| (19) | 2001 $ signs | Ambien | 10 mg | G.D. SEARLE CO | 9% | | 9% | est 8/1/2001 | 636,600 | 57,718 | 57.39 | 54.78 | 1.45 | 43.51 | 15.38 |
| (20) | 2001 $ signs | Ambien | 5 mg | G.D. SEARLE CO | 9% | | 9% | est 8/1/2001 | 85,170 | 3,861 | 70.59 | 62.30 | 1.70 | 51.02 | 11.28 |
| (21) | 2001 $ signs | Arthrotec EC | 50 mg | G.D. SEARLE CO | 8% | | 8% | est 8/1/2001 | 638,600 | 65,180 | 98.11 | 90.62 | 1.25 | 75.19 | 15.43 |
| (22) | 2001 $ signs | Celebrex | 100 mg | G.D. SEARLE CO | 13.5% | | 13.5% | est 8/1/2001 | 1,437,600 | 228,788 | 88.24 | 82.81 | 1.07 | 64.30 | 18.51 |
| (23) | 2001 $ signs | Celebrex | 200 mg | G.D. SEARLE CO | 13.5% | | 13.5% | est 8/1/2001 | 2,523,400 | | 78.51 | 73.70 | 1.81 | 54.41 | 16.31 |
| (24) | 2001 $ signs | Covera-HS SA | 180mg | G.D. SEARLE CO | 10% | | 10% | est 8/1/2001 | 19,600 | 1,777 | 39.50 | 39.04 | 1.04 | 31.09 | 7.95 |
| (25) | 2001 $ signs | Covera-HS SA | 240mg | G.D. SEARLE CO | 10% | | 10% | est 8/1/2001 | 23,300 | 2,113 | 54.15 | 51.93 | 1.35 | 40.60 | 11.33 |
| (26) | conversion files | Avandia | | Glaxo SKB | 10% | | 10% | Mar-00 | | | | | | | |
| (27) | conversion files | Ceftin | | Glaxo SKB | 15% | | 15% | 4Q 99 | | | | | | | |
| (28) | 2001 $ signs | Aciphex EC | 20 mg | JANSSEN (JNJ) | 14% | | 14% | est 8/1/2001 | 194,710 | 17,654 | 113.99 | 104.59 | 2.69 | 80.70 | 23.89 |
| (29) | 2001 $ signs | Nizoral | 2% cream | JANSSEN (JNJ) | 15% | | 15% | est 8/1/2001 | 18,215 | 1,742 | 32.29 | 32.70 | 0.81 | 24.21 | 8.49 |
| (30) | 2001 $ signs | Risperdal | 0.25 mg | JANSSEN (JNJ) | 15% | | 15% | est 8/1/2001 | 1,436,540 | 114,251 | 90.88 | 84.26 | 1.88 | 64.34 | 19.91 |
| (31) | 2001 $ signs | Risperdal | 0.5 mg | JANSSEN (JNJ) | 15% | | 15% | est 8/1/2001 | 2,728,960 | 217,040 | 90.88 | 84.26 | 1.79 | 61.37 | 22.89 |
| (32) | 2001 $ signs | Risperdal | 1 mg | JANSSEN (JNJ) | 15% | | 15% | est 8/1/2001 | 1,800,520 | 143,199 | 90.88 | 84.26 | 1.79 | 61.37 | 22.89 |
| (33) | 2001 $ signs | Risperdal | 1 mg/ml | JANSSEN (JNJ) | 15% | | 15% | est 8/1/2001 | 327,090 | 28,014 | 102.97 | 84.26 | 2.32 | 79.40 | 23.57 |
| (34) | 2001 $ signs | Risperdal | 2 mg | JANSSEN (JNJ) | 15% | | 15% | est 8/1/2001 | 762,680 | 80,658 | 151.28 | 137.41 | 3.13 | 107.10 | 30.30 |
| (35) | 2001 $ signs | Risperdal | 3 mg | JANSSEN (JNJ) | 15% | | 15% | est 8/1/2001 | 532,560 | 42,356 | 178.64 | 161.48 | 3.70 | 131.11 | 35.01 |
| (36) | 2001 $ signs | Risperdal | 4 mg | JANSSEN (JNJ) | 15% | | 15% | est 8/1/2001 | 196,300 | 15,612 | 235.42 | 211.45 | 4.87 | 166.67 | 44.78 |
| (37) | 2001 $ signs | COZAAR | | MERCK & CO. | 15% | | 15% | est 8/1/2001 | | | | | | | |
| (38) | 2001 $ signs | COZAAR | | MERCK & CO. | 15% | | 15% | Jan-01 | | | | | | | |
| (39) | 2001 $ signs | Pepcid | 40 mg | MERCK & CO. | 10% | | 10% | est 8/1/2001 | | | | | | | |
| (40) | top 100 file | Pepcid | 20 mg | MERCK & CO. | 18% | 18% | 18% | Jan-01 | 588,131 | 28,707 | 116.00 | 106.36 | 1.27 | 76.10 | 30.26 |
| (41) | 2001 $ signs | Pepcid | 40 mg | MERCK & CO. | 18% | | 18% | Jan-01 | 10,850 | 984 | 112.10 | 102.93 | 2.45 | 73.54 | 29.39 |
| (42) | conversion files | Vioxx | 0.5 mg | MERCK & CO. | 15% | | 16% | 09/01/98 | | | | | | | |
| (43) | top 100 file | CLOZARIL | | Novartis | 3% | 13% | 13% | Jan-01 | | | | | | | |
| (44) | top 100 file | EXELON | | Novartis | 7% | 5% | 12% | Jan-01 | | | | | | | |
| (45) | top 100 file | MIACALCIN | | Novartis | 8% | 2% | 10% | Jan-01 | | | | | | | |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (46) top 100 file | NOVOLIN 70/30 | | Novo Nordisk | $1.25 | $8.48 | 46% | Jan-01 | | | | | | |
| (47) top 100 file | NOVOLIN N | | Novo Nordisk | $1.25 | $8.48 | 46% | Jan-01 | | | | | | |
| (51) 2001 $ signs | Detrol LA | 2mg SA | PHARMACIA/UPJHN | 15% | | 15% | est 8/1/2001 | 43,910 | 3,981 | 81.75 | 76.22 | 1.85 | 55.55 | 20.67 |
| (52) 2001 $ signs | Detrol LA | 4mg SA | PHARMACIA/UPJHN | 15% | | 15% | est 8/1/2001 | 209,730 | 18,925 | 83.90 | 78.11 | 1.90 | 57.04 | 21.07 |
| (53) 2001 $ signs | Fragmin | 2500 U/.2ml | PHARMACIA/UPJHN | 9% | | 9% | est 8/1/2001 | 1,348 | 367 | 76.75 | 71.82 | 5.58 | 55.83 | 15.99 |
| (54) 2001 $ signs | Fragmin | 5000 U/.2ml | PHARMACIA/UPJHN | 9% | | 9% | est 8/1/2001 | 3,208 | 873 | 124.50 | 113.84 | 9.06 | 90.61 | 23.23 |

**Notes**

(1) not necessarily the beginning effective date but the rebate as of a particular point in time.