# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* DAVID M. KAMMERER; | : | |
| **STATE OF CALIFORNIA** *ex rel.* DAVID M. KAMMERER; | : | **CIVIL ACTION NO. 05-11518-RGS** |
| **STATE OF DELAWARE** *ex rel.* DAVID M. KAMMERER; | : | |
| **DISTRICT OF COLUMBIA** *ex rel.* DAVID M. KAMMERER; | : | |
| **STATE OF FLORIDA** *ex rel.* DAVID M. KAMMERER | : | |
| **STATE OF GEORGIA** *ex rel.* DAVID M. KAMMERER | : | |
| **STATE OF HAWAII** *ex rel.* DAVID M. KAMMERER; | : | |
| **STATE OF ILLINOIS** *ex rel.* DAVID M. KAMMERER; | : | **THIRD AMENDED FALSE CLAIMS ACT COMPLAINT** |
| **STATE OF INDIANA** *ex rel.* DAVID M. KAMMERER | : | |
| **STATE OF LOUISIANA** *ex rel.* DAVID M. KAMMERER; | : | **Leave to file granted on April 8, 2010** |
| **STATE OF MASSACHUSSETTS** *ex rel.* DAVID M. KAMMERER; | : | **JURY DEMAND** |
| **STATE OF MICHIGAN** ex rel. DAVID M. KAMMERER | : | |
| **STATE OF NEVADA** *ex rel.* DAVID M. KAMMERER; | : | |
| **STATE OF NEW HAMPSHIRE** *ex  rel.* DAVID M. KAMMERER; | : | |
| **STATE OF NEW MEXICO** *ex rel.* DAVID M. KAMMERER; | : | |

**STATE OF NEW YORK** *ex rel.* DAVID M.          :
KAMMERER

**STATE OF TENNESSEE** *ex rel.* DAVID          :
M. KAMMERER;

**STATE OF TEXAS** *ex rel.* DAVID M.          :
KAMMERER;

**STATE OF VIRGINIA** *ex rel.* DAVID M.          :
KAMMERER;

**and**          :

**DAVID M. KAMMERER,** individually,

          **Plaintiffs,**          :

   **VS.**

**JOHNSON & JOHNSON**          :

**and**

**OMNICARE, INC.**          :

          **Defendants.**          **:**

---

### THIRD AMENDED FALSE CLAIMS ACT COMPLAINT
### OF QUI TAM PLAINTIFF DAVID KAMMERER
### AND DEMAND FOR JURY TRIAL

### I.  INTRODUCTION

   1.   In light of the United States' recent filing of a Complaint in this action, Qui Tam

Plaintiff David Kammerer, through his attorneys, hereby amends his Complaint to clarify the

claims he intends to pursue.

2.   This is an action brought pursuant to the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.,* and pursuant to the false claims laws of sixteen states and the District of Columbia (hereinafter collectively referred to as "the FCA")*,* by the relator, David M. Kammerer, in his own capacity and on behalf of the United States of America and the states of California, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Massachusetts, Michigan, Nevada, New Hampshire, New Mexico, New York, Tennessee, Texas, Virginia, and the District of Columbia.  This action seeks treble damages and civil penalties on behalf of the federal government and the state government plaintiffs arising from the defendant's:  (i) conspiracy to get false or fraudulent claims paid by the federal-state Medicaid program (Title XIX of the Social Security Act) in all states in which Omnicare does business; (ii) causation and making of false claims presented to federal and state officials and employees administering these Medicaid programs and other federal health programs;  (iii) the causation, making and use of false records to get such false claims paid; and, (iv) the making of false statements to avoid an obligation to pay funds owed to these Medicaid Programs pursuant to the Medicaid Rebate Program, codified at 42 U.S.C. § 1396r-8.

3.   The Complaint alleges a series of illegal transactions in which the defendant Johnson & Johnson ("J&J") paid remuneration, in the form of concealed "post-purchase discounts" and rebates, as well as free goods, price-freezes, grants and other cash payments, to Omnicare, Inc. ("Omnicare"), to induce Omnicare to purchase J&J's patented, brand name pharmaceutical drugs and increase purchases of their drugs compared to competing drugs. Omnicare, headquartered in Covington, Kentucky, provides pharmaceutical services and distributes pharmaceuticals primarily for long-term care facilities and nursing homes throughout the United States.   Relator alleges that Omnicare took affirmative steps to increase the sales of J&J's products vis-à-vis competing drugs as a direct result of these illegal inducements,

including substituting drugs for those prescribed without proper physician authorization as required under state law.   Relator further alleges that Omnicare and J&J took affirmative steps to conceal from federal and state government auditors the illegal remuneration alleged herein; for instance, Omnicare executives requested, and J&J agreed to send false invoices to Omnicare pharmacies that left off the existence and terms of the rebates and "post purchase discounts."   In addition, J&J did not disclose its grants and other cash and in-kind remuneration on the invoices sent to Omnicare.

4.     As a result of these secret and illegal transactions, J&J violated the FCA by knowingly:  (i) causing Omnicare to submit claims to state and federal officials administering the Medicaid program that were false because Omnicare, as a recipient of illegal kickbacks from J&J, was ineligible to seek payment of Medicaid funds; (ii) causing Omnicare to submit claims to these Medicaid officials that were false because the billed-for drugs had not been dispensed or prescribed in accordance with federal and state law, but rather had been dispensed as a result of Omnicare's illegal substitution of drugs for physician-prescribed drugs or had been prescribed as a result of Omnicare's false or misleading representations to physicians regarding the drugs;  (iii) conspiring with Omnicare to get the foregoing false or fraudulent claims paid by the federal-state Medicaid program; (iv) creating false records - - such as inflated invoices that failed to disclose the post-purchase discounts and rebates,  and the cash grants and other remuneration paid to Omnicare to induce purchases of the drug - - to further the conspiracy to defraud the Medicaid program; and (v) making false statements to Medicaid concerning their best prices to customers to avoid payment of rebates owed Medicaid under the Medicaid Rebate Program, 42 U.S.C. § 1396r-8, and making false statements to other government payers concerning their best prices to get false claims paid.

5.     As a result of the illegal transactions described above, Omnicare violated the FCA

by:  (i)  submitting claims to state and federal officials administering the Medicaid program that were false because Omnicare, as a recipient of illegal kickbacks from the drug manufacturers, was ineligible to seek payment of Medicaid funds; (ii) submitting claims to these Medicaid officials that were false because the billed-for drugs had not been dispensed or prescribed in accordance with federal and state law, but rather had been dispensed as a result of Omnicare's illegal substitution of drugs for physician-prescribed drugs or had been prescribed as a result of Omnicare's false or misleading representations to physicians regarding the drugs;  (iii) conspiring with the drug manufacturer defendants to get the foregoing false or fraudulent claims paid by the federal-state Medicaid program;  and (iv) causing, assisting and using false records to get false claims paid - - such as the invoices prepared by the drug manufacturer defendants that failed to disclose the post-purchase discounts and rebates, and the cash grants and other remuneration paid to Omnicare to induce purchases of drugs.

## II.  JURISDICTION AND VENUE

6.      This is a civil action arising under the laws of the United States to redress violations of the federal FCA, 31 U.S.C. §§ 3729 *et seq*.   This court has jurisdiction over the subject matter of this action: (i) pursuant to 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for FCA actions; (ii) pursuant to 28 U.S.C. § 1331, which confers federal subject matter jurisdiction; and (iii) pursuant to 28 U.S.C. § 1345, because the United States is a plaintiff.

7.      This court has supplemental jurisdiction over the claims brought on behalf of the state plaintiffs under 28 U.S.C. §1367.

8.      This court has jurisdiction under 31 U.S.C. § 3732(a) over the defendant J&J because J&J can be found in, is authorized to transact business in, and is now transacting business in this District.   In addition, acts of J&J which are proscribed by 31 U.S.C. § 3729 have

occurred in this District.

9.      Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391.

10.     Jurisdiction over all state law claims alleged herein is proper under 31 U.S.C. § 3732(b).

## III. THE PARTIES

### QUI TAM PLAINTIFF DAVID KAMMERER

11.     Qui Tam Plaintiff David M. Kammerer ("Relator" or "Kammerer"), a citizen and resident of the State of Ohio, brings this action on his own behalf, as well as on behalf of the United States, pursuant to 31 U.S.C. §3730(b)(1), and on behalf of the state plaintiffs, pursuant to the state false claims statutes set forth herein.   Prior to filing this action, Relator, David M. Kammerer, on multiple occasions has provided the bulk of the information herein alleged to the United States.   In particular, during interviews on June 2, 2003 and July 8, 2003, Kammerer disclosed to  Special Agent Tom Harkness of the Food and Drug Administration and to Special Agent James J. O'Leary, Special Agent for the Office of Inspector General of the United States Department of Health & Human Services, that J&J paid Omnicare concealed rebates and discounts to induce Omnicare to grant preferential treatment to Risperdal®.   In a contemporaneous letter, on June 25, 2003, Kammerer through counsel sent a letter to Special Agents Harkness and O'Leary.  In that letter, and in attachments to that letter, Kammerer specifically disclosed to these public officials that Omnicare forecasted profit based on the degree to which Omnicare managed to switch customers over from one drug to a competing drug, and that Omnicare actively worked to increase the market share of these certain drugs at the expense of the drugs' competitors. Moreover, the spreadsheets submitted with the disclosure letter specifically confirmed what Kammerer had told Special Agents Harkness and O'Leary: that Omnicare was paid special rebates by manufacturers in exchange for increasing the market

share of their drug over the market share of their competitors.   In these disclosures, Kammerer

further disclosed that "PAL [physician authorization letters] were used to help facilitate moving

market share…from one drug to another drug that has equivalent therapeutic effects."  June 25,

2003, Letter from Charlie Atkins, Esq. to Thomas G. Harkness and James J. O'Leary.   Special

Agents Harkness and O'Leary were at the time among the lead government investigators looking

into the truth or falsity of claims submitted by Omnicare and its pharmaceutical manufacturer

suppliers.   In August 2003, Relator specifically alleged violations of the federal False Claims

Act and state false claims laws as a result of Omnicare's steering patients and physicians towards

certain drugs at the expense of competing drugs solely in order to increase its own profits.

12.     Relator holds both BA and MBA degrees.   He was an employee of Omnicare, Inc.

("Omnicare") from September 1997 until his resignation in April 2002.   Omnicare owns and

manages pharmacies servicing long term care facilities, such as nursing homes and assisted living

facilities.

13.     Relator began his employment as a financial analyst for Tim Bien, R.Ph., FASCP,

Omnicare Senior VP Purchasing & Professional Services.   Relator was responsible for preparing

spreadsheets and performing other types of financial analysis to evaluate  potential "profit

opportunities" which upper management proposed to achieve through Omnicare purchasing

initiatives, clinical initiatives, and Medicaid reimbursement.  It was routine for Relator to develop

models of these profit opportunities for upper management and then to forecast profitability as the

model caused shifts in market share from drug A to drug B (*i.e.,* shifts in the amount of a given drug

sold by Omnicare as a percentage of the total sales by Omnicare of that drug and its competitors), or

shifts in the prescribed dose forms of a particular drug. These models also took into account the

inducements that would be paid by different manufacturers if Omnicare committed to buy

exclusively from the manufacturer or to increase the manufacturer's market share vis-à-vis its

competitors.

14.     In October 2000, Omnicare promoted Relator to Director of Medicaid Reimbursement.  In this position, at the direction of upper management, Relator also performed financial analysis of:  (i) the impact of the changes in the various states' Medicaid reimbursement policies on Omnicare profits, and (ii) the methods proposed by upper management to mitigate any negative impact on the company's profitability from such changes.

15.     The transactions alleged herein are based upon the direct and personal knowledge of the Relator as a former insider within Omnicare's corporate headquarters.

16.     Kammerer has not based his Complaint upon any prior public disclosures of the allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.  His lawsuit is derived solely from his position as an Omnicare insider. Moreover, even if his lawsuit were deemed to be based upon a public disclosure, he is an original source under 31 U.S.C. §3730 (e)(4), and other state whistleblower statutes as alleged herein.  He has direct and independent knowledge of the information upon which the allegations are based and has voluntarily provided the information to the government before filing this qui tam action based upon that information.

**GOVERNMENT PLAINTIFFS**

17.     The United States of America, and the states of California, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Massachusetts, Michigan, Nevada, New Hampshire, New Mexico, New York, Tennessee, Texas, Virginia, and the District of Columbia, are the plaintiffs for whom recovery is sought for damages to the federal-state Medicaid programs, and other government-funded health programs including without limitation Medicare, CHAMPUS/TRICARE, and VA-funded programs.

**DEFENDANTS**

18.     Johnson & Johnson ("J&J") researches, manufactures, and markets a variety of health care products, including pharmaceutical drugs.   Johnson & Johnson owns over 250 operating companies that employ approximately 120,500 people in 57 countries.   Johnson & Johnson sells products throughout the world, including nationwide in the United States. Johnson & Johnson is a publicly traded company with headquarters in New Brunswick, New Jersey.

19.     Omnicare owns and manages pharmacies servicing long term care facilities, such as nursing homes and assisted living facilities.  On its web page, the company has held itself out as the nation's "leading provider of pharmaceutical care for seniors."   In recent years, the company serviced more than 1.4 million residents in health care facilities in 47 states and Canada.  State Medicaid programs, which are funded by the federal government as well as the states, pay for a significant share of Omnicare's sales.


### IV. GOVERNING LAW

#### (A) Federal Health Care Program Anti-Kickback Statute/State Anti-Kickback Laws

20.     The Federal Health Care Program Anti-Kickback Statute, enacted as Section 1128B(b) of the Social Security Act, 42 U.S.C. § 1320a-7b, prohibits persons from paying, soliciting or receiving illegal remunerations in order to induce business reimbursable under federal or state health care programs (here, Medicaid).   42 U.S.C. § 1320a-7b(a).   The types of remuneration covered specifically include kickbacks, bribes, and rebates, whether made directly or indirectly, overtly or covertly, in cash or in kind.   42 U.S.C. § 1320a-7b(b).   The prohibited conduct includes remuneration intended to induce referrals of patients or the purchasing, leasing or ordering, or arranging of any good, facility, service or item to be paid for by Federal or State

health care programs.   Id.   The law contains a number of safe harbors, including product-specific discounts disclosed on invoices, none of which apply to the non-product specific inducements alleged herein.   See 42 U.S.C. § 13201-7b(b)(3)(A); 42 C.F.R. § 1001.952(h). The states contain analogous anti-kickback statutes.   See, e.g., Florida Stat., Ch. 409.920(2)(e); Illinois 305 ILCS 5/8A-3(c); Michigan C.L.A. 400.601.

**(B) Medicaid Reimbursement for Pharmaceutical Drugs**

21.     As a condition of paying part of the claims submitted to a state Medicaid program, the federal government requires states to pay pharmacies no more than the lower of their "estimated acquisition cost plus reasonable dispensing fee" or their "usual and customary charge to the general public" for: i) drugs other than "multiple source drugs" for which the federal government has established a specific Medicaid payment limit under 42 C.F.R. § 447.332, and ii) any brand name drug that a physician has certified in his or her own handwriting as being medically necessary for a particular recipient.   42 C.F.R. § 447.331(b).   To arrive at an "estimated acquisition cost" most states look to the drug's Average Wholesale Price ("AWP"), as set forth in industry publications. State Medicaid programs require pharmacies to state their "usual and customary charge" to the "general public" on their bills to Medicaid.

**(C) Medicaid Rebate Program**

22.     With limited exceptions, the Omnibus Budget Reconciliation Act of 1990, 42 U.S.C. § 1396a-v, requires a pharmaceutical company to enter into a "rebate agreement" with the U.S. Secretary of Health and Human Services in order to qualify any covered, outpatient prescription drug manufactured by the company for Medicaid payment.   42 U.S.C. § 1396r-8(a)(1). Compliance with this rebate agreement is a material condition precedent to Medicaid's

agreement to pay claims for the drug.   Id.   The rebate agreement requires each of these drug manufacturers to pay a quarterly rebate directly to each participating state Medicaid program for each of the manufacturers' drugs purchased by that state under its Medicaid plan during the quarter.   The rebate must be equal to the difference between the average manufacturer's price ("AMP") and the manufacturer's best price, defined as the lowest price available, anywhere in the nation, from the manufacturer to any non-Medicaid payer, or 15.1% of AMP, whichever is greater.   42 U.S.C. § 1396r-8(c)(1).   Manufacturers selling covered, outpatient drugs paid for by state Medicaid programs must report their AMPs and best prices to the state Medicaid programs on a quarterly basis.   42 U.S.C. § 1396r-8(b)(3).   The Office of Inspector General of the Department of Health & Human Services has the right to audit the "best price" and "average manufacturer's price" information submitted by the manufacturers.   Id.  The state Medicaid programs report their total Medicaid drugs dispensed in the quarter to each drug manufacturer and the Secretary.   42 U.S.C. § 1396r-8(b)(2)(A).   The Centers for Medicare & Medicaid Services ("CMS") computes the amount of the rebate that may be applied by each state program and the states use this information to notify and invoice each drug manufacturer for the quarterly rebate due.

### (D) Federal Supply Schedule

23.   The federal General Service Administration ("GSA") negotiates Federal Supply Schedule ("FSS") prices with drug companies with the goal of achieving for government agencies purchasing pharmaceutical drugs the "best price" that the companies offer their most favored customers;  in order to contract with the government to have a drug listed on the FSS, the GSA consequently requires drug companies to disclose to GSA their best prices to commercial customers, including all discounts and other price concessions.   48 C.F.R. §

538.270.  GSA will demand the "best price" for the FSS contract price unless it concludes that

"the prices offered to the Government are fair and reasonable, even though comparable discounts

were not negotiated."  <u>Id</u>.  In addition, companies with a good listed on the FSS must agree to

agree to reduce their FSS price for the good if they lower their prices to commercial customers

during the contract term in a manner that adversely affects the relationship between the FSS

price and the comparable commercial prices relied upon by the government in establishing the

FSS price.  See 48 C.F.R. § 538.272.

### (E)  Pharmacy Provider Agreements

24.     In order for a pharmacy to be eligible to bill and obtain payment from Medicaid,

the state Medicaid programs require the pharmacy to abide by applicable federal and state law,

including federal and/or state anti-kickback law.  For example, in Illinois, in order to bill

Medicaid, a pharmacy must first enter into an agreement in which it acknowledges that

"compliance with such laws and handbook provisions [regarding services] is a condition of

payment for all claims submitted."  (Agreement For Participation in the Illinois Medical

Assistance Program (available at: http://www.dpaillinois.com/enrollment/)).  The referenced

handbook provides in turn as follows:  "Providers are subject to State and federal laws pertaining

to penalties for vendor fraud *and kickbacks*."  Handbook for Providers of Medical Services,

Chapter 100 – General Policy & Procedures, Section 136 (available at:

http://www.dpaillinois.com/handbooks/chapter100.html).   (Emphasis added.)  In Michigan,

pharmacies billing Medicaid agree to comply with the policies and procedures for the Michigan

Medical Assistance Program contained in the Medicaid Provider Manual.   Medical Assistance

Provider Enrollment & Trading Partner Agreement (available at:

http://www.michigan.gov/mdch/0,1607,7-132-2945_5100-43782--,00.html).   The Michigan

Provider Manual expressly states that "receiving kickbacks" is an example of prohibited "Medicaid fraud."   Michigan Department of Community Health Medicaid Provider Manual, pp. 40-41 (available at: http://www.michigan.gov/som/0,1607,7-192-29929-87572--,00.html).   In Florida, pharmacies agree that they must be in compliance with federal, state and local law before Florida "may make payments for medical assistance."   Florida Non-Institutional Medicaid Provider Agreement (available at: https://flmedprovenroll.com/provenroll/Jsp/checklist.html).   The Provider Handbook then sets forth the Florida Anti-Kickback Statute as an example of a law with which providers must comply.   Agency for Health Care Administration Florida Medicaid Provider General Handbook, Chapter 2, p. 42. (available at: http://floridamedicaid.acs-inc.com/index.jsp?display=handbooks).

### (E ) Medical Practice Act Requirements

25.     As a general matter, pursuant to state laws, drugs requiring a prescription under federal or state law may only be dispensed by a licensed pharmacist acting upon a lawful prescription issued by a licensed physician.   In short, pharmacists are not authorized under the law to prescribe either a type, form or dosage of a controlled substance.   Such prescriptions must be made by physicians based upon their independent, professional judgment.

### (F)  The Federal False Claims Act

26.     The federal civil False Claims Act ("federal FCA"), 31 U.S.C. §§ 3729 et seq. (prior to May 2009 amendments), imposes civil liability, *inter alia*, on any person who:  i) knowingly presents or causes to be presented to the United States false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used a false statement to get a false claim paid or approved by the United States; (3) conspires to defraud the

government by getting a false or fraudulent claim allowed or paid; or, (4) knowingly makes, uses or causes to be made or used a false statement to conceal, avoid or decrease an obligation to pay or transmit money to the United States.   The federal FCA defines "knowingly" to include not only acting with actual knowledge of the truth or falsity of claims, but also acting with "reckless disregard" or "deliberate ignorance" of the truth or falsity of claims.   The federal FCA provides a remedy of treble damages and mandatory penalties of $5,500 to $11,000 for each violation of the Act.   Pursuant to the federal FCA's so-called "qui tam provision," 31 U.S.C. § 3730(b), private individuals may bring suit on their own behalf as well as on behalf of the United States to recover damages and penalties for the United States.   With certain exceptions set forth in the Act, the federal FCA provides that the private plaintiff, the so-called "qui tam plaintiff" or "relator", shall receive 15 to 25% of the government's recovery if the government intervenes in the case, or 25 to 30% if the qui tam plaintiff litigates the case on his or her own after a government declination.

### (G) State False Claims Laws

27.      The State plaintiffs herein have enacted similar laws that permit a private person to bring suit on behalf of the state to recover damages from persons that knowingly submit false claims to the state or engage in related misconduct, and that provide for rewards for the private person if the state prevails in the action.   The statutory cites to these laws are set forth herein.

## V.   THE FRAUDULENT TRANSACTIONS

### (A) CONCEALED "MARKET SHARE" REBATES

28.      Since at least 1998, J&J, in violation of federal and state anti-kickback law, has entered into agreements with Omnicare to pay remuneration in the form of cash rebates (sometimes referred to within Omnicare as "post-purchase discounts") to Omnicare to induce

Omnicare to increase its purchases of the atypical, antipsychotic drug Risperdal® and other J&J

drugs.   These agreements ordinarily set up a "tiered" rebate structure, with the amount of the

available rebate on a drug (expressed as a percentage of the purchase price of the drug)

increasing as Omnicare increased its purchases of J&J's drug as a percentage of its total

purchases of the drug and competing drugs used to treat the same condition.   This was known as

a "market share rebate."   Less frequently, the amount of the rebate increased according to the

absolute volume of Omnicare's purchases from the defendant drug manufacturer.

29.     In exchange for these rebates, Omnicare took affirmative steps to shift its

customers, including Medicaid customers, over to J&J's drug Risperdal® and other J&J

medications from other drugs in the same competitive classes.   Omnicare's top executives

pressured and directed staff in Omnicare pharmacies to do what was necessary to increase the

market share of the J&J drug in question.   The following paragraphs in this Section 5 of the

Complaint detail examples of the rebates that constituted illegal kickbacks under federal and

state law.

30.     On August 1, 1998, Johnson & Johnson and Omnicare knowingly entered into an

agreement whereby Johnson and Johnson, after a six month start-up period, agreed to pay

Omnicare rebates based on the market share that Omnicare achieved for Johnson & Johnson's

Risperdal® tablets compared to Risperdal's®  drug-competitors.   Omnicare would get a 5%

rebate during the first six months.  After six months, it would get a 6% rebate if it achieved a

market share between 35% and 37% for Risperdal®, 9% if it achieved a market share between

37% and 42%, and 11% if it achieved a market share above 42%.   In addition, Johnson &

Johnson agreed to pay Omnicare a cash equivalent 1% "corporate overlay."  All rebates as well

as the 1% corporate overlay were conditioned on Omnicare's: (i) giving Risperdal® the Selected

position in its drug formulary over all other and competing anti-psychotic drugs, (ii) favoring

Risperdal ® over all other available branded drugs, and (iii) informing physicians of Risperdal's® formulary position, so as to "enhance compliance with this Agreement".   Johnson & Johnson and Omnicare concealed these rebates from the federal-state Medicaid program, and Omnicare took affirmative steps to increase Risperdal's®  market share at the expense of its competitor-drugs as a direct result of this inducement, including using PALs to support its dispensing of Risperdal®  when a physician had, in fact, prescribed a different drug.   Johnson & Johnson and Omnicare entered into similar agreements in other years with respect to Risperdal®, and also entered into similar agreements with regard to other drugs.   For example, in the fourth quarter of 2001, Johnson & Johnson paid Omnicare the following "post-purchasing" discounts on the following drugs, in exchange for Omnicare's granting preferential treatment to the drugs: 8%  (equal to $ 2,282,609) on purchases of Duragesic®; 5% (equal to $326,003) on purchases of Ultram®; 14% (equal to $866,096) on purchases of Ditropan® XL; 2% (equal to $98,640) on purchases of Topamax®; 7% (equal to $231,897) on purchases of Reminyl®; 2% (equal to $51,956) on purchases of Aciphex®; and 2% (equal to $50,212) on purchases of Regranex®.

## (B) GRANT AGREEMENTS, MANAGEMENT MEETING FUNDS AND OTHER IN-KIND AND CASH REMUNERATION

31.    Defendant Omnicare solicited from J&J, and J&J agreed to pay and did pay Omnicare illegal remuneration in exchange for inducing sales of Risperdal® and other drugs to Medicaid customers under the guise of cash "grants" relating to the Omnicare "ReView" program.   Omnicare maintained that its ReView program educated Omnicare pharmacists about the underutilization of many drugs that could be beneficial for the elderly, which included, of course, the Medicaid-eligible population in the long term care facilities serviced by Omnicare pharmacies.   Omnicare sought and received this grant money without making any representations to J&J as to any costs that it had incurred in connection with the "ReView"

program, or committing to perform specified work in exchange for these grants.   Moreover,

Relator witnessed his supervisor, Tim Bien, contact pharmaceutical companies and request and

receive immediate injections of "grant money" on occasions when Joel Gemunder, Omnicare's

CEO, was concerned that Omnicare's profits for the quarter otherwise would not satisfy

Omnicare's investors.

32.     The grant payments were ordinarily in round numbers.  For example, the "grant

amounts" contributed by J&J during 2000 are shown in the following table:

**OMNICARE REVIEW GRANTS**

| PHARMACEUTICAL MFG | "DEPOSIT" | COMMENT/TOTAL |
|---|---|---|
| JOHNSON & JOHNSON | $1,000 – APRIL 2000; $100,000 X 2 – JUNE, 2000; $50,000 – AUG. 2000 | $251,000 |

33.     The review program was a scheme that was entered into knowingly by Omnicare

and J&J to hide from Medicaid what were actually illegal kickbacks paid by J&J to induce

Omnicare to grant preferential treatment to its products over the products of its competitors.

Omnicare and J&J hid these payments from the Medicaid program, leaving them off the invoices

sent by J&J to Omnicare pharmacies that purported to reflect the terms of sale.   Omnicare

agreed to and did grant preferential treatment to J&J products as a result of these grant payments.

34.     Beginning at least as early as 1999, and continuing at least through 2001, J&J also

paid remuneration to Omnicare to induce Omnicare's purchases of its drugs in the form of funds

that were identified as ostensibly covering the costs of its attendance at Omnicare's annual

management meetings in Amelia Island.   However, these payments bore no rational relationship

to the costs of the conference, and were requested by Omnicare, and paid by J&J, in order to

secure Omnicare's business.

35.     On information and belief, J&J offered and Omnicare accepted other forms of concealed cash and in-kind remuneration intended to secure Omnicare's business, including free product and various cash payments.

### (C) THERAPEUTIC INTERCHANGE PROGRAM

36.     Internally, Omnicare used the term "therapeutic interchange" to characterize the scheme pursuant to which Omnicare took steps to increase the market share of J&J's atypical, anti-psychotic drug, Risperdal® and other J&J drugs, at the expense of its competitors in order to earn the rebates and other cash inducements offered by J&J.   Omnicare misrepresented in a memo to its own Directors of Operations its motivation for the therapeutic interchange program. Thus, Omnicare Senior Vice President Tim Bien stated there were: "several advantages to switching to the drug of choice; the drugs we have been switching to have the same or better efficacy; they save the payer money; and our costs go down.   It is for these reasons that it's imperative we continue increasing our market share in the drug of choice."  (May 21, 1999, Memorandum from Tim Bien to Directors of Operations, Re: Price Increase Opportunity.) These "drugs of choice," however, were drugs subject to kickback arrangements, and increasing the market share of these drugs would not always "save the payer money."   Bien also requested that the Directors of Operations increase their private pay prices on drugs that competed with the "drugs of choice" in order to help Omnicare reach its market share goals and to defray increased costs.  This reference to "increased costs" was also misleading as Omnicare's costs for the other drugs had not increased.

37.     Bien directed and pressured the managers of Omnicare pharmacies to increase their sales of Risperdal® and other Omnicare-favored drugs manufactured by J&J at the expense of non-favored, competing drugs.   One means employed by Omnicare to switch customers from a non-favored drug to a favored drug was the issuance by an Omnicare pharmacy of a "Physician

Authorization Letter" or "PAL" to all physicians writing prescriptions for residents in facilities

serviced by the pharmacy.   The PAL stated that the pharmacy would substitute certain drugs for

other drugs if the doctor signed the PAL authorizing the pharmacy to do so.   In many instances,

however, the PAL misrepresented the comparative costs and benefits of the drugs.   In other

instances, pharmacies would switch over customers to the preferred drug even in the absence of

the prescribing physician signing the PAL.   When the switches were accomplished through

misleading PALs, or without the written authorization of the prescribing physician, these

methods often violated state law.

## (D) FALSE STATEMENTS AND FALSE CLAIMS

### 1. False Statements to Medicaid regarding "Best Prices"

38.     Kammerer alleges on information and belief that J&J did not disclose these

concealed market share and other rebates, and the purchase inducements disguised as grant and

management conference funds, to the Medicaid program as required by the Medicaid Rebate

Program or to the federal General Services Administration (GSA) as required of companies

selling goods on the Federal Supply Schedule (FSS).   For example, Kammerer alleges that the

significant second Quarter 2001 rebates paid by J&J on various products, which are set forth in

Exhibit A hereto, were not disclosed to the Medicaid Program and the federal government in

connection with J&J's "best price" disclosures.   Kammerer alleges on information and belief,

that J&J falsely represented to Medicaid and other federal government payers that their "best

prices" were amounts that exceeded the post-rebate, dead net prices given to Omnicare.   In

doing so, they knowingly made false statements to avoid an obligation imposed by the Medicaid

Rebate Program and other laws to pay funds to federal and state governments.

39.     The bases for Kammerer's allegation in the immediately preceding paragraph

include the following two facts: First, while at Omnicare, Kammerer reviewed "best price" files

on CMS's website that contained Federal Supply Schedule (FSS) prices, among other

government prices, for many brand name drugs.   In reviewing these files, Kammerer saw that,

for many drugs, the FSS "best prices" were significantly higher than Omnicare's dead net cost

for the same drugs for the same period of time.   The federal General Service Administration

negotiates FSS prices with drug companies with the goal of achieving for the government the

"best price" that the companies offer their most favored customers, and requires drug companies

to disclose their best prices to commercial customers, including all discounts and other price

concessions.   See 48 C.F.R. Part 538.   Relator consequently concluded that, in those instances

in which Omnicare's dead net cost is significantly lower than the FSS price, it is likely that that

the drug manufacturers are withholding from government payers the deep post-purchase

discounts and rebates provided to Omnicare.   Second, while at Omnicare, Relator learned from

Omnicare Senior Vice President Tim Bien that Omnicare and the drug manufacturers wished to

keep the rebate information highly confidential for several reasons, including their desire to

conceal the existence and amount of the rebates from government auditors.   Accordingly, to

further this goal, the pharmaceutical manufacturer defendants and Omnicare agreed that the

manufacturers would not disclose the existence or terms of the rebates on the invoices sent to

Omnicare pharmacies.   Moreover, within Omnicare, the purchasing department shared

information about Omnicare's true dead net cost for drugs with only a handful of top executives.

## 2. False Statements Concerning Terms of Sale

40.     J&J agreed with Omnicare not to disclose the existence or terms of the market

share and other rebates on the invoices that it sent to Omnicare pharmacies to reflect the terms of

sale.   The invoices sent to the Omnicare pharmacies consequently contained false information

regarding the terms of sale.   The invoices sent by J&J to Omnicare were also false in that they

did not reveal the Review grants and management conference payments and other cash and in-

20

kind payments, which also were part of the terms of sale.

41.     J&J created, and Omnicare caused and assisted in the creation of these invoices that falsely recorded the terms of sale with full knowledge that the invoices were false. Moreover, Omnicare, with full knowledge that the invoices were inflated, used the invoices in its pharmacies as official records of the terms of sale.

### 3.  False Statements on Provider Agreements

42.     Omnicare knowingly made additional false statements on provider agreements submitted to the federal-state Medicaid programs; in particular, Omnicare agreed that it would comply with applicable federal and state laws, including anti-kickback law and the laws governing pharmacies and the practice of medicine, despite the fact that it knew it would not and could not comply with such laws as it had entered into kickback arrangements with J&J, and was undertaking an illegal therapeutic interchange scheme to switch patients over to Risperdal® from competing atypical, anti-psychotic drugs.

### 4.  Purpose of False Statements

43.     The foregoing false records were created and used in furtherance of the conspiracy between Omnicare and J&J to defraud the Medicaid program, to get false claims paid by the federal-state Medicaid program and other federal government payers, and to assist J&J avoid its obligation to pay rebates to Medicaid under the Medicaid Rebate Program.

### 5.  False Claims for Medicaid Payment

44.     A significant percentage of the Risperdal® prescriptions that Omnicare favored through its therapeutic interchange program in exchange for J&J rebates were sold to Medicaid beneficiaries and covered under the Medicaid program.   To obtain payment for Risperdal®, Omnicare presented claims to the administrators of the federal-state Medicaid program employed by the states.   The states paid Omnicare's claims, and presented claims to the federal

government to obtain the federal share of the reimbursement that the states paid Omnicare.   The Omnicare claims were false because Omnicare was ineligible for payment due to its receipt of illegal kickbacks and the illegal methods it employed to switch customers to Risperdal®.   The state claims for federal share likewise were false in that they effectively passed on Omnicare's false claims and/or sought payment for the false claims of Omnicare.

45.     J&J knowingly caused Omnicare to make these false claims for payment of Risperdal®  prescriptions to the administrators of the federal-state Medicaid program, and knowingly caused the states to submit false claims for federal funding.   Omnicare knowingly submitted these false claims for payment of Risperdal®  prescriptions to administrators of the state-federal Medicaid program, and knowingly caused the states to submit false claims for federal financing of Omnicare's false claims.

### 6.  Conspiracy to get False or Fraudulent Claims Paid

46.     Through the acts and omissions set forth above, Omnicare entered into a conspiracy with J&J to get false or fraudulent claims for Risperdal® paid by the federal-state Medicaid program.   Thus, with J&J, Omnicare agreed to: (i) accept a financial payment in exchange for purchases of Risperdal®  from the manufacturer;  (ii) use invoices to record the terms of sale of Risperdal®  that concealed the financial payment, and thereby assist J&J conceal the payment from state Medicaid programs and maintain the profit margin or "spread" it could offer Omnicare; and (iii) favor Risperdal®  over competitor drugs in exchange for the inducement by increasing its purchases of the drugs relative to competing drugs, refraining from switching customers over to competing drugs, and/or switching customers over to the drugs.

### COUNT ONE – FEDERAL FALSE CLAIMS ACT,
### 31 U.S.C. § 3729(a)(1)-(3) and (7)(prior to May 20, 2009 amendment)

47.     Plaintiff re-alleges Paragraphs 1 through 46, inclusive.

48.     Based on the conduct alleged herein,  J&J ise liable under 31 U.S.C. § 3729(a)(1)

(2008), which imposes liability on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval."

49.     Based on the conduct alleged herein, J&J is liable under 31 U.S.C. § 3729(a)(2) (2008), which imposes liability on any person who "knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government."

50.     Based on the conduct alleged herein, J&J is liable under 31 U.S.C. § 3729(a)(3) (2008), which imposes liability on any person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid."

51.      Based on the conduct alleged herein, J&J is liable under 31 U.S.C. § 3729(a)(7) (2008), which imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."

## COUNT TWO – CALIFORNIA FALSE CLAIMS LAW,

### Cal. Gov. Code § 12650

52. Plaintiff re-alleges paragraphs 1-46 inclusive.

53.     Based on the foregoing allegations, Defendants are liable under Cal. Gov. Code § 12650, *et seq*.

## COUNT THREE – DELAWARE FALSE CLAIMS AND REPORTING ACT,

### 6 Del. C. § 1201, et seq.

54.     Plaintiff re-alleges paragraphs 1-46 inclusive.

55.     Based on the foregoing conduct, Defendants are liable under the Delaware False Claims and Reporting Act, 6 Del. C. § 1201, *et seq*.

## COUNT FOUR – D.C. PROCUREMENT RELATED CLAIMS ACT,
### D.C. Code § 2-308.13, *et seq*.

56.     Plaintiff re-alleges paragraphs 1-46 inclusive.

57.     Based on the foregoing conduct, Defendants are liable under the District of

Columbia Procurement Related Claims Act, D. C. Code § 2-308.03, *et seq*.

## COUNT FIVE – FLORIDA FALSE CLAIMS ACT,
### Fla. Stat. §§ 68.081-68.09

58.  Plaintiff re-alleges paragraphs 1-46 inclusive.

59.   Based on the foregoing conduct, Defendants are liable under the Florida False

Claims Act, Fla. Stat. §§ 68.080 et seq.

## COUNT SIX – GEORGIA STATE FALSE MEDICAID CLAIMS ACT,
### Georgia Code, Title 49, Ch. 4

60.  Plaintiff re-alleges paragraphs 1-46 inclusive.

61.   Based on the foregoing conduct, Defendants are liable under the Georgia State False

Medicaid Claims Act, Georgia Code, Title 49, Ch. 4.

## COUNT SEVEN – HAWAII  FALSE CLAIMS LAW,
### HRS § 661-21, *et seq*.

62.     Plaintiff re-alleges paragraphs 1-46 inclusive.

63.     Based on the foregoing conduct, Defendants are liable under the Hawaii false

claims law, HRS  § 661-21, *et seq*.

## COUNT EIGHT – ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT,
### 740 ILCS 175/1 *et seq*.

64.     Plaintiff re-alleges paragraphs 1-46 inclusive.

65.     Based on the foregoing conduct, Defendants are liable under the Illinois

Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq*.

## COUNT NINE – INDIANA FALSE CLAIMS & WHISTLEBLOWER PROTECTION LAW,
### Ind. Code § 5-11-5.5.-1, *et seq*. (2005)

66.     Plaintiff re-alleges paragraphs 1-46, inclusive.

67.     Based on the foregoing conduct, Defendants are liable under the Indiana False

Claims & Whistleblower Protections Law, Ind. Code § 5-11-5.5-1, *et seq*.

## COUNT TEN – LOUSIANA QUI TAM ACTION ACT,
### La. R. S. 46:438:3, *et seq*.

68.     Plaintiff re-alleges paragraphs 1-46 inclusive.

69.     Based on the foregoing conduct, Defendants are liable under the Louisiana Qui
Tam Action Act, La. R. S. 46:439.1, *et seq*.

## COUNT ELEVEN -  MASSACHUSETTS FALSE CLAIMS LAW,
### ALM CH. 12 § 5A-0, *et seq*.

70.     Plaintiff re-alleges paragraphs 1-46 inclusive.

71.     Based on the foregoing conduct, Defendants are liable under the regulations of the

Massachusetts Department of the Attorney General, ALM GL ch. 12 § 5A-O.

## COUNT TWELVE - MICHIGAN MEDICAID FALSE CLAIMS ACT,
### MICH. CODE 400.60, *et seq*.

72.     Plaintiff re-alleges paragraphs 1-46 inclusive.

73.     Based on the foregoing conduct, Defendants are liable under the Michigan

Medicaid False Claims Act, Mich. Code 400.601 et seq.

## COUNT THIRTEEN – NEVADA SUBMISSION OF FALSE CLAIMS TO STATE OR LOCAL GOVERNMENT ACT,
### NRS § 357.010, *et seq*.

74.     Plaintiff re-alleges paragraphs 1-46 inclusive.

75.     Based on the foregoing conduct, Defendants are liable under the Nevada

Submission of False Claims to State or Local Government Act, NRS § 357.010, *et seq*.

## COUNT FOURTEEN– NEW HAMPSHIRE FRAUD & FALSE CLAIMS LAW,
### N.H. RSA § 167:58, *et seq*.

76.     Plaintiff re-alleged paragraph 1-46, inclusive.

77.     Based on the foregoing conduct, Defendants are liable under the New Hampshire

Fraud  & False Claims law, N.H. RSA § 167:58, *et seq.*

## COUNT FIFTEEN – NEW MEXICO MEDICAID FALSE CLAIMS ACT, N.M. LAWS 49, § 1, *et seq*.

78.     Plaintiff re-alleges paragraphs 1-46 inclusive.

79.     Based on the foregoing conduct, Defendants are liable under the New Mexico

Medicaid False Claims Act, 2004 N. M. Laws 49, § 1, *et seq.*

## COUNT SIXTEEN - NEW YORK FALSE CLAIMS ACT 2007 N.Y. LAWS 58, § 38

80.     Plaintiff re-alleges paragraphs 1-46 inclusive.

81.     Based on the foregoing conduct, Defendants are liable under the New York False

Claims Act, 2007 N.Y. Laws 58, § 38.

## COUNT SEVENTEEN – TENNESSEE MEDICAID FALSE CLAIMS ACT, TENN. CODE ANN. § 71-5-181-185, *et seq.*

82.     Plaintiff re-alleges paragraphs 1-49 inclusive.

83.     Based on the foregoing conduct, Defendants are liable under the Tennessee

Medicaid False Claims Act, Tenn. Code Ann.  § 71-5-181, *et seq.*

## COUNT EIGHTEEN – TEXAS MEDICAID FRAUD PREVENTION STATUTE, TEX. HUM RES. CODE §36.001, *et seq.*

84.     Plaintiff re-alleges paragraphs 1-49 inclusive.

85.     Based on the foregoing conduct, Defendants are liable under the Texas Medicaid

Fraud Prevention Statute, Tex. Hum. Res. Code § 36.001, *et seq.*

## COUNT NINETEEN – VIRGINIA FRAUD AGAINST TAXPAYERS ACT, VA. CODE ANN. § 8.01-216.1-216.10, *et seq.*

86.     Plaintiff re-alleges paragraphs 1-49 inclusive.

87.     Based on the foregoing conduct, Defendants are liable under the Virginia Fraud

Against Taxpayers Act, Va. Code Ann. § 8.01-216.1, *et seq.*

**WHEREFORE**, Relator prays that judgment be entered in favor of the United States, the several states and District of Columbia and Relator, as herein alleged in the foregoing Nineteen Causes of Action against the Defendants, ordering that:

A.     Defendants cease and desist their violations of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.* and the relevant state laws as above alleged;

B.     J&J pay an amount equal to three times the amount of damages the United States has sustained because of it's actions, as above alleged, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §3729, *et seq.*;

C.     Defendants pay to the each of the several states or district as herein above alleged, the damages and civil penalties as provided by the relevant statute.

D.      Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

E.     Relator be awarded the maximum amount allowed pursuant to the legislation or regulations of each state or district, as alleged above;

F.     Relator be awarded all costs of this action, including expenses and attorney fees and costs, pursuant to 31 U.S.C. § 3730(d), together with such costs as are provided pursuant to the legislation or regulations of each state, as alleged above; and,

G.     The United States, said states or district and Relator recover such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury for all issues herein properly so tried.

Respectfully submitted,

UNITED STATES OF AMERICA
*ex rel.* DAVID KAMMERER,
STATE OF CALIFORNIA
*ex rel.* DAVID KAMMERER, STATE OF
DELAWARE *ex rel.* DAVID KAMMERER,
DISTRICT OF COLUMBIA *ex rel.* DAVID
KAMMERER, STATE OF FLORIDA *ex rel.*
DAVID KAMMERER, STATE OF
GEORGIA *ex rel.* DAVID KAMMERER,
STATE OF HAWAII
*ex rel.* DAVID KAMMERER, STATE OF
ILLINOIS *ex rel.* DAVID KAMMERER,
STATE OF INDIANA *ex rel.* DAVID
KAMMERER, STATE OF LOUSIANA
*ex rel.* DAVID KAMMERER,
STATE OF MASSACHUSETTS
*ex rel.* DAVID KAMMERER,
 STATE OF MICHIGAN *ex rel.*
DAVID KAMMERER, STATE OF
NEVADA *ex rel.* DAVID KAMMERER,
STATE OF NEW HAMPSHIRE *ex rel.*
 DAVID KAMMERER, STATE OF NEW
MEXICO *ex rel.* DAVID KAMMERER,
STATE OF NEW YORK *ex rel.* DAVID
KAMMERER, STATE OF TENNESSEE
*ex rel.* DAVID KAMMERER, STATE OF
TEXAS *ex rel* DAVID KAMMERER, STATE OF
VIRGINIA *ex rel.* DAVID KAMMERER,
STATE OF TEXAS *ex rel.* .DAVID KAMMERER
and DAVID KAMMERER, individually,


_____/s/ Thomas P. Smith_____
Thomas P. Smith (BBO #555513)
Caffrey & Smith, P.C.
300 Essex Street
Lawrence, MA. 01810
Tel. No. 978-686-6151
Fax No. 978-683-3399

Dated:  April 21, 2010

LEAD COUNSEL:

Shelley R. Slade, Esq.
(Admitted Pro Hac Vice)
Robert L. Vogel, Esq.
(Admitted Pro  Hac Vice)
Vogel,  Slade & Goldstein, LLP
1718 Connecticut Ave., N.W., 7th Fl.
Washington, D.C. 20009
Tel. No. (202) 537-5900
Fax No. (202) 537-5905

Certificate of Service

I hereby certify that a true copy of the above document was served electronically upon counsel for the parties who have entered an appearance in the case by employing the ECF filing system on April 21, 2010.

＿＿＿ /s/ Thomas P. Smith
Thomas P. Smith